H. P. RYAN v. INTERNATIONAL HARVESTER COMPANY OF AMERICA.
HOUSTON McKENZIE v. SAME.
D. E. QUINN v. SAME.
REYNOLDS QUINN v. SAME.[1]

December 23, 1938.

Nos. 31,861, 31,862, 31,863, 31,864.

[1]Reported in 283 N. W. 129.

*Meighen, Knudson & Sturtz,* for appellant.
*Schmitt, Johnson & Farrish,* for respondents.

JULIUS J. OLSON, JUSTICE.

Four negligence cases, all arising out of the same accident, were tried together below and are so submitted here. Plaintiffs prevailed. Defendant's alternative motion for judgment notwithstanding or new trial was denied, and it appeals.

Plaintiff Ryan, of Sedalia, Missouri, was the owner of a Ford tractor-trailer used in transporting goods. His action was brought to recover property damage to his truck and the goods carried therein. This equipment was driven by plaintiff McKenzie at the time of accident. He sought damages for personal injuries suffered. Plaintiff Reynolds Quinn, a young man about 18 years of age, was McKenzie's assistant as relief driver. His action, too, was for recovery of damages for personal injuries. Plaintiff D. E. Quinn is Reynolds' father, and his action was brought to recover medical

and hospital expenses incurred in his son's behalf, also for loss of his son's earnings during minority. All cases have for their basis the alleged negligence of defendant's employe, one Braseth, while operating its pickup truck.

McKenzie had purchased 160 sacks of potatoes for Ryan at Hollandale, and at Mankato 150 cases of beer. This shipment was being transported by McKenzie and Quinn as Ryan's servants and employes; the destination, Sedalia, Missouri. Reynolds had driven from Hollandale to Mankato. From there McKenzie took over the driving, starting at about seven o'clock in the evening of December 1, 1937. They proceeded westerly on highway No. 60, a concrete pavement 20 feet in width but having four 10-foot lanes some 300 feet in both directions (east and west) from the junction of the mentioned highway with highway No. 169 entering from the south. When about 300 feet to the east thereof McKenzie looked to the rear and ascertained that there was no traffic coming from that direction; but he observed the lights of a car coming from the west, estimated to be about a mile distant. He signaled for a left turn by opening the left door of his cab and by continuing to hold it open until he entered the turn into highway No. 169. The lights from the oncoming car were not then to be seen as there is a dip in the road some two-tenths of a mile west of the junction. A moment later he again noticed the lights from the oncoming car striking the window in the door to his right. It was traveling at a very high rate of speed. It came "like a shot." Although McKenzie had reached highway No. 169 and had the greater part of his equipment beyond the southerly limit of highway No. 60, a portion thereof extended into the intersection when defendant's truck, driven by Braseth, smashed into the Ryan truck. The impact was one of terrific force. A gasoline drum was upon plaintiffs' truck back of the cab on its right side and held in place by means of a securely fastened angle iron. The drum was smashed in the crash with the result that its contents were immediately spilled upon the highway. Flames burst forth in such manner as to almost destroy the vehicles involved. Reynolds Quinn, McKenzie's relief driver, was sitting to the latter's right. He was dozing, practically asleep,

when the impact took place. Upon awakening he jumped out upon the highway but slipped and fell into a slippery substance composed of the spilled gasoline and rubber of the tires which had also caught fire. His clothing and hair became ignited. In his bewilderment and suffering from the burning substances with which he had come into contact, he started running into a near-by field with McKenzie in hot pursuit. The latter finally managed to put out the fire on Reynolds' body and clothes and to calm him so as to get him in condition to send back to Mankato for hospital and medical aid. McKenzie next took Braseth, the driver of defendant's truck, in hand. Braseth refused to get out of his truck but kept trying to back it out of the fire although his vehicle, too, was burning.

McKenzie thereupon took him out bodily and led him to the side of the road. Braseth claimed there was another man in the car, but in this he was mistaken. He was alone. While holding Braseth around the waist McKenzie felt he had a bottle in his pocket and detected from Braseth's breath that he was definitely under the influence of liquor. There is other evidence to substantiate the claim that Braseth had been indulging in rather extensive use of alcoholic beverages that afternoon. He, too, was injured in the crash, and was taken to Mankato for medical treatment. The highway patrol arrived shortly after the accident and took charge of affairs.

■ There was sharp conflict in the testimony between McKenzie and Braseth. Defendant stoutly maintained that McKenzie was the one responsible for the accident. It pleaded and sought to sustain a counterclaim against Ryan for the value of its truck and expenses incurred in workmen's compensation and medical care provided its servant Braseth. We think there is sufficient evidence to sustain the resulting verdicts insofar as liability is concerned. Not only have we the direct testimony of McKenzie as to what occurred, but there is also the testimony of the highway patrolman who came upon the scene while the wreckage was still there. Also, there is the mute but persuasive evidence of the vehicles as disclosed by photographs taken shortly thereafter. The location upon the highway after the collision of the involved vehicles goes far to

sustain plaintiffs' claims; as also do skidmarks of defendant's truck. Plaintiffs' heavy truck had been pushed sideways on a dry pavement, although it was a much heavier outfit than was defendant's truck. The force of the impact had jackknifed plaintiffs' truck and trailer and had smashed the steel oil drum and bent the heavy angle iron holding it.

Both highways are much traveled, and Braseth was well acquainted with this particular location. Reflector "slow" signs were erected and maintained several hundred feet in each direction from the junction of the two highways; also the junction was protected by a "yellow blinker light."

The court, after having fully stated to the jury the statutory requirements relating to the issues here presented, said:

"You have heard these various statutory provisions in reference to the operation of motor vehicles, and a violation of any one of them other than the one in reference to the speed at which cars are driven, constitute negligence as a matter of law. But you must also bear this in mind, that even though a person might be found to be negligent in reference to the operation of his motor vehicle, you must go further and you must determine whose negligence, if any, was the proximate cause of the accident. What was the direct cause of the accident in question? Whose negligence directly caused the accident and the resulting injury?"

We think Braseth's negligence was abundantly established. If he had kept his eyes open he could not help seeing plaintiffs' truck turning southerly into the intersection while he was still a safe distance away from the junction of the road leading south. McKenzie was traveling very slowly. According to defendant's computations as set forth in its brief, he traveled 81 feet while Braseth was traveling 567 feet; and that is based upon acceptance of Braseth's claim of traveling only at the rate of 35 miles per hour. The evidence for plaintiffs is such as would justify the jury in finding his speed was much greater than that. We think the issues were for the jury.

■ Error is assigned because the court sustained plaintiffs' objection to the following question put by defendant's counsel to Mr. Braseth: "In all your driving up to this time had you ever had a collision with anybody?" We think the court was right. The rule is: "Evidence that a person is of a careful and prudent habit is inadmissible to prove that he was not negligent upon a particular occasion." 4 Dunnell, Minn. Dig. (2 ed.) § 7051, and cases cited under note 99.

In this connection it is appropriate to refer also to defendant's assignment of error in respect to the following questions and answers elicited by plaintiffs' counsel from McKenzie, testifying on rebuttal as to the condition of his lights on this occasion:

Q. "You would say they were ordinary driving lights?

A. "Ordinary driving lights.

Q. "Have you ever been stopped for your lights by any highway officer or other officer?

Mr. Meighen: "Objected to as not proper redirect examination, incompetent, irrelevant and immaterial.

Court: "Overruled.

A. "No, sir.

Q. "Would you say that was the condition of your lights on the evening of December 1, 1937?

A. "I'll say it was, yes."

This testimony came in just as the case was being finally closed. The subject was not pursued further. No exception was taken at the time. (It was, however, assigned as error on defendant's motion for new trial.) Granting the ruling to be erroneous, we are of the view it was harmless. No one claims Ryan's truck was inadequately lighted. Defendant's criticism of the lights was that McKenzie did not use his dimmers when he made the turn and that thereby Braseth was blinded.

■ The verdicts are challenged as excessive. Mr. Ryan recovered a verdict of $2,675. There was much dispute in respect to the value of his truck, accessories, and the goods constituting its load. An examination of the record leads to the view that the evidence sus-

tains the recovery. There was room for a larger verdict, likewise there was ample room for a much smaller one. Our only concern is whether there is any evidence reasonably tending to support the verdict. We think there was. The same holds true with respect to the verdict of McKenzie. The jury allowed him $650 for personal injuries suffered. That verdict we think is moderate and certainly not subject to this criticism. The same holds true respecting the verdict of Mr. Quinn as the father of Reynolds Quinn. That was in the sum of $750. Considering the expenses incurred and the obvious loss of earnings during his son's minority, we think that verdict, too, is moderate. The verdict rendered for the boy, Reynolds Quinn, was for $3,000. The doctor described his condition when brought to the hospital the night of the accident, amongst other things saying:

"His hands and face were covered with melted tar; the face was swollen and extensive burning of the entire skin of the face and ears extending down into the neck; his eyelashes and eyebrows were burned off and the hair was singed, and there was extensive burns involving both hands, the right hand more than the left; he was in condition of shock."

He was at the hospital three weeks and while there suffered intense pain. "We gave him frequent doses of morphine" and "barbital at night," this being a "medicine that encourages sleep." It was necessary for a time "to feed him by a tube because he was unable to swallow." In addition, there has developed a "tumorous swelling" on his cheek resulting "from that burn," and his "left eye has been giving him some trouble ever since" the accident; "it waters when he is out in the cold weather or in the presence of a glaring light." His fingernails and thumbnails were so badly burned as to "become loosened," but fortunately, at time of trial, new nails were "growing in from below." His right hand is much weakened. His "gripping power is about 40 per cent of normal." And "the weakness and pain in his right hand is a result of injury to the nerves, and to a certain extent the irritation of his eyes is the result of nerve damage." The future is indefinite and un-

certain, but the doctor was of opinion that "it will take quite a long period of time at least for that power to return." (The doctor was speaking of the injury to the right hand.) There is more that might be said, but we think enough has been recited to justify us in sustaining the verdict, the same having been approved by the trial court.

■ Misconduct on the part of the prevailing parties is claimed as another ground for a new trial. Some difficulty arose between Ryan and McKenzie after the trial but before defendant's motion here for review was heard. McKenzie contacted a firm of lawyers in Missouri who had rendered some assistance to defendant's attorneys in the present case. An affidavit was procured from him, and later used, as an additional ground why a new trial should be granted. Therein McKenzie stated he was present and overheard a conversation between plaintiffs Ryan and Quinn and one of the jurors sitting in the case then on trial to the effect that, "As one of the topics of discussion, Mr. Ryan and Mr. Quinn referred to the automobile accident and alleged facts relating thereto and having a bearing upon the issues involved." He does not "recall now the precise words" used but does "distinctly recall that they talked about the wreck." It is interesting to note in this connection that as a part of the same transaction when this affidavit was procured counsel for defendant and McKenzie entered into a written agreement under the terms of which McKenzie was to receive *"in the event the court grants defendant's motion for new trial upon the foregoing ground,* or any other ground, that *defendant will settle,* adjust and determine *the claim of said McKenzie against defendant and forthwith pay the same on the basis of the verdict rendered by said jury* upon said trial * * *." (Italics supplied.)

However, within a day or two thereafter McKenzie made another affidavit wherein he stated that "absolutely nothing wrong was said or done, nor was the case talked about, or considered in any manner whatsoever." And there are many other affidavits furnished by plaintiffs in opposition to those relied upon by defendant. Amongst them is the affidavit of the juror involved, who stated in his affidavit that he was and for 24 years had been a resident of Blue Earth

county; that his occupation was that of a farmer and that his farm was approximately 25 miles from Mankato, the place of trial; that he had never seen any of the plaintiffs except in court and had never associated or mingled with any of them; that the afternoon of February 16 was a blustery one, and he deemed it unwise to drive home; hence at ten o'clock that evening he registered at the hotel and took lodging there that particular night only. After registering he stepped into the barroom of the hotel for the purpose of getting a glass of beer, and when he came to the bar he observed plaintiff Reynolds Quinn, who was also drinking a glass of beer. Their meeting was purely accidental. Their only conversation was about the weather, nothing whatever being said about the case. Nothing else took place, and the juror went back to his room and did not again see Quinn or any other plaintiff until he saw them in court the next day.

The court, in a memorandum attached to the order denying defendant's motion, expressed the view that McKenzie's affidavit (upon which defendant's motion necessarily was based to get a new trial on this ground) was "largely a scheme" to get his money "regardless of the outcome of the motion" and "to get even with" his former employer, plaintiff Ryan. "And," pertinently added the court, "neither the conduct of Mr. McKenzie nor the conduct of counsel for the defendant commends itself to this court."

This matter, of course, was primarily one for the trial court's discretionary determination. Its action in the premises should not be reversed on appeal unless the record discloses an abuse of discretion. That court is in a much better position than we are to determine whether substantial prejudice resulted from the claimed misconduct.

"Conversations between jurors and litigants or attorneys during a trial may or may not amount to misconduct, depending upon the subject touched and the object in view. But all such communications are improper as offending the ethics of a trial and creating occasion for criticism or suspicion. And it may be said, when it is made to appear that an attorney in the case and a juror have had a

conversation during the course of a trial and because thereof misconduct is charged, it is, as a rule, incumbent upon the party accused to make an explanation that the conversation had no relation to the case. If he will not, he should be required to take a new trial. If he explains, the question is for the court. His explanation may exculpate him or it may not. This does not put the burden upon him to show that he was not guilty of misconduct. The attacking party must, upon the whole record, satisfy the court that there was misconduct." Nelson v. Kuhfeld, 158 Minn. 163, 165, 197 N. W. 253, 254.

Here, as in Lucas v. Ganley Bros. Inc. 166 Minn. 7, 14, 206 N. W. 934, 937, the wrong charged "is met by affidavits of the juror and the attorney [including the involved plaintiffs] containing a full and satisfactory explanation of the circumstances and nature of the conversation."

While there are other assignments of error, we find, upon examination thereof, that they do not require separate discussion.

The order is affirmed.

MR. CHIEF JUSTICE GALLAGHER took no part in the consideration or decision of this case.

