# WILLIAM E. HALLADA, JR., v. GREAT NORTHERN RAILWAY.[1]

February 25, 1955.

No. 36,378.

[1]Reported in 69 N. W. (2d) 673.

82

*Edwin C. Matthias, Anthony Kane, W. P. Westphal,* and *R. J. Quinlivan,* for appellant.

*Davis, Rerat, Yaeger & Lush* and *Harry H. Peterson,* for respondent.

MATSON, JUSTICE.

In an action under the Federal Employers' Liability Act and the Federal Safety Appliance Act, defendant appeals from an order

denying its motion for judgment not withstanding the verdict or in the alternative for a new trial.

On October 16, 1952, plaintiff was a brakeman on one of defendant's freight trains traveling east from Devils Lake, North Dakota. The train reached Lakota, North Dakota, about 5:15 a. m. There the engine and two boxcars were uncoupled from the remainder of the train and used in switching operations. A flatcar was kicked westward onto a side track. Plaintiff boarded the flatcar for the purpose of stopping it with the hand brake at a storage pile located farther westward along the side track. The flatcar stopped prematurely, however, so that its east end was near the frog of the switch, thereby blocking passage along the track from which it had been kicked.

Thereafter, the acting foreman told plaintiff to check whether the brake was set on the flatcar. Plaintiff inspected the brake chain and reported that the brake was not set. In response to the acting foreman's direction, plaintiff again boarded the flatcar and began to take up the slack of the hand brake. The flatcar was to be shoved farther westward to the storage pile. Plaintiff testified that he intended to take up the slack on the wheel-operated hand brake near the east end of the flatcar and then move to the center of the car *before signaling the acting foreman* to shove the flatcar westward. The acting foreman, however, contends that plaintiff had previously told him verbally to go ahead and back up, which would mean that the two boxcars attached to the engine could be moved westward in order to shove the flatcar to the storage pile along the side track.

While plaintiff was still attempting to take up the slack from the brake, he heard the noise of an oncoming car behind him. He grabbed the brake wheel and braced himself. The sudden impact from the collision of the oncoming cars and engine with the flatcar, without effecting a coupling, threw plaintiff forward and backward a couple of times before he lost his grip and was thrown to the railroad right of way.

Plaintiff lay on the right of way for 15 or 20 minutes. Then he walked to the depot where a doctor administered morphine to relieve the pain. He was next taken in an ambulance about 60 miles to a

hospital at Grand Forks. On plaintiff's arrival at the hospital, his right arm was operated on in an effort to restore blood circulation which had stopped after the artery had been severed by the broken bones in the arm. This effort was unsuccessful; therefore, it was necessary to amputate plaintiff's arm the next day. A few days later, plaintiff complained of pain in his back. He was X-rayed and no bony damage was found by the railroad's doctor. Nevertheless, diathermy was administered to plaintiff's back. There was considerable hemorrhaging in the arm and extending under the chest muscles. Plaintiff remained in the hospital for 28 days.

At the time of the trial, the bone in the stump of plaintiff's right arm measured about two and a half inches in length. Plaintiff cannot wear a usable artificial arm. He could, however, wear an artificial arm for the cosmetic purpose of filling out a coat sleeve. The objective findings of the doctors established atrophy of the right chest and shoulder muscles, amputation of the right arm, a very mild compression fracture of the eighth thoracic vertebra, and muscle spasm or tightness in lower region of the lower thoracic and upper lumbar vertebra. Plaintiff's subjective symptoms are pain in his back, numbness in his buttocks, "phantom pain" where his right hand and arm used to be, and tenderness in the stump of his right arm. There was considerable discrepancy among the opinions of the doctors as to the probable duration of the pain of which plaintiff complained.

The jury awarded plaintiff a verdict of $170,154.81. Defendant moved for judgment notwithstanding the verdict or a new trial, and it appeals from the denial of this motion.

The issues arising on this appeal involve: (1) Whether the failure of two cars to couple upon impact, when both coupled knuckles are open, constitutes a violation of the Federal Safety Appliance Act; (2) negligence; (3) proximate cause; (4) whether the trial court erred in refusing to submit written interrogatories to the jury; (5) whether the charge to the jury was prejudicially erroneous for failure to separate and distinguish sufficiently plaintiff's claim for relief under the Federal Safety Appliance Act from his negligence claim under the Federal Employers' Liability Act; (6) alleged errors

in the exclusion of evidence; (7) misconduct of plaintiff's expert witness; (8) alleged misconduct of plaintiff's counsel; (9) whether the verdict is excessive and whether same resulted from passion and prejudice.

The Federal Safety Appliance Act (27 Stat. 531, 45 USCA, § 2) provides that:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The duty imposed by this section is absolute and wholly unrelated to any question of negligence.[2] If the coupler is properly set and fails to couple on the particular occasion in question, it is immaterial to the determination of whether the Federal Safety Appliance Act has been violated whether the coupler functioned properly before or after the particular occasion in question.[3] In the instant case it is undisputed that the couplers failed to couple upon impact. The United States Supreme Court has held, however, that mere failure of couplers to couple upon impact does not necessarily constitute a violation of the Federal Safety Appliance Act.[4] Recently that court in the Affolder case made it clear that its statement that the failure of a coupler to couple upon impact is in itself an actionable wrong *assumes that the coupler was placed in a position to operate on*

[2] Johnson v. Chicago G. W. Ry. Co. 242 Minn. 130, 64 N. W. (2d) 372; Carter v. Atlanta & St. Andrews Bay Ry. Co. 338 U. S. 430, 70 S. Ct. 226, 94 L. ed. 236; O'Donnell v. Elgin, J. & E. Ry. Co. 338 U. S. 384, 70 S. Ct. 200, 94 L. ed. 187; Delk v. St. Louis & San Francisco R. Co. 220 U. S. 580, 31 S. Ct. 617, 55 L. ed. 590.

[3] Carter v. Atlanta & St. Andrews Bay Ry. Co. 338 U. S. 430, 434, 70 S. Ct. 226, 229, 94 L. ed. 236, 241.

[4] Affolder v. New York, C. & St. L. R. Co. 339 U. S. 96, 70 S. Ct. 509, 94 L. ed. 683.

*impact.*[5] Since a decision is not authoritative beyond its operative facts, the general language of the Affolder case must be construed to mean nothing more than that the failure of couplers to couple upon impact is in itself an actionable wrong *only if at least one of the couplers is in an open position so as to operate on impact.* Thus, for instance, if the knuckles on both of the couplers are closed and the cars fail to couple upon impact, the railroad has a good defense against liability under the Federal Safety Appliance Act because at least one knuckle must be open in order for the couplers to couple.[6]

■ The defendant contends that whenever a coupling is attempted on a curve a failure to adjust the drawbars is likewise a good defense under the Federal Safety Appliance Act. There is a distinction, however, between failure to couple because of misalignment and a failure because of closed knuckles. Knuckles are purposely opened and closed whereas the drawbar unintentionally becomes misaligned.[7] Misalignment may result from wear which causes more lateral play than is necessary to permit the rounding of curves.[8] An additional difference is that knuckles can be opened without going between the cars, whereas alignment is made by moving the drawbar which necessitates going between the cars.[9] In the light of these differences, it is well to keep in mind that one of the basic purposes of the act is to require the automatic coupling and uncoupling without the necessity of men going between the cars.[10]

---

[5]Affolder v. New York, C. & St. L. R. Co. 339 U. S. 96, 99, 70 S. Ct. 509, 511, 94 L. ed. 683, 688.

[6]*Ibid.*

[7]McGowan v. Denver & R. G. W. R. Co. (Utah) 244 P. (2d) 628.

[8]See, San Antonio Ry. Co. v. Wagner, 241 U. S. 476, 36 S. Ct. 626, 60 L. ed. 1110; Atlantic City R. Co. v. Parker, 242 U. S. 56, 37 S. Ct. 69, 61 L. ed. 150; White v. Atchison, Topeka & Santa Fe Ry. Co. (Mo.) 244 S. W. (2d) 26.

[9]McGowan v. Denver & R. G. W. R. Co. (Utah) 244 P. (2d) 628.

[10]O'Donnell v. Elgin, J. & E. Ry. Co. 338 U. S. 384, 70 S. Ct. 200, 94 L. ed. 187; Hampton v. Des Moines & Cent. I. R. Co. (8 Cir.) 65 F. (2d) 899; Hohenleitner v. Southern Pac. Co. (C. C. D. Ore.) 177 F. 796; Holz v. Chicago, M. St. P. & P. R. Co. 176 Minn. 575, 224 N. W. 241.

In view of these facts and the prior decisions which have refused to absolve railroads from liability on a defense of drawbar misalignment,[11] it would be illogical to defeat a basic purpose of the Federal Safety Appliance Act by extending the rule of the Affolder case beyond its authoritative scope and thereby to attribute to the United States Supreme Court an intent to reverse its prior holdings by an implication to be drawn solely from the generality of its language. We therefore hold that, although the failure of couplers to couple automatically upon impact does not constitute a violation of the Federal Safety Appliance Act unless one of the coupler knuckles is open, it is no defense that the failure to couple upon impact is caused by a misalignment of the drawbars.

Irrespective of how the Affolder case is interpreted, we must conclude upon the evidence herein that the jury was warranted in finding a violation of the Federal Safety Appliance Act. The degree to which a drawbar must be misaligned before there is a failure to couple upon impact depends on the sharpness of the curve, the alignment of the other drawbar, the extent to which the knuckles are open, and whether only one or both knuckles are open.[12] When the knuckles on both drawbars are open, the alignment does not have to be as close as when only one knuckle is open.[13] The evidence in the record shows that the knuckle on the east end of the flatcar and the knuckle on the west end of the boxcar were both open. It also shows that the curve was slight so as not to greatly affect alignment and further that only 15 feet east of the east end of the flatcar the track was straight. Under the circumstances the cars should have coupled upon the curve in question unless the couplers were defective. Upon such evidence the jury was warranted in finding a violation of the Fed-

[11]See, Atlantic City R. Co. v. Parker, 242 U. S. 56, 37 S. Ct. 69, 61 L. ed. 150; San Antonio Ry. Co. v. Wagner, 241 U. S. 476, 36 S. Ct. 626, 60 L. ed. 1110; Chicago, St. P. M. & O. Ry. Co. v. Muldowney (8 Cir.) 130 F. (2d) 971; Hampton v. Des Moines & Cent. I. R. Co. (8 Cir.) 65 F. (2d) 899; McGowan v. Denver & R. G. W. R. Co. (Utah) 244 P. (2d) 628.

[12]McGowan v. Denver & R. G. W. R. Co. (Utah) 244 P. (2d) 628.

[13]*Ibid.*

eral Safety Appliance Act. Similar findings have been upheld upon similar evidence.[14]

A violation of the Federal Safety Appliance Act creates an absolute liability for damages *proximately caused* either *in whole or in part* by such violation.[15] Stated another way, the injured person may recover whether the defective equipment used in violation of the act was the sole or only a contributing cause of his injury.[16] The evidence herein sustains a finding that, if the couplers had coupled upon impact as required by the act, much of the slack would thereby have been taken up and the violent jerk normally caused by such colliding cars would have been neutralized. The couplers failed, however, to couple upon impact, and the car on which plaintiff was standing was consequently thrown forward with such great force and violence that it would have been difficult for any person, situated as plaintiff then was, to maintain his balance and not be thrown off the car. The failure of couplers to function properly, which in turn results in sudden and violent car movements which throw brakemen off their balance, is a recognized proximate cause of injuries which are sustained when the brakemen are thrown off the cars upon which they are riding.[17] A railroad's liability to an employee for injuries sustained in the performance of his duties as a proximate result of a violation of the Federal Safety Appliance Act comes into full play despite the fact that the employee when injured

---

[14]Atlantic City R. Co. v. Parker, 242 U. S. 56, 37 S. Ct. 69, 61 L. ed. 150; San Antonio Ry. Co. v. Wagner, 241 U. S. 476, 36 S. Ct. 626, 60 L. ed. 1110; White v. Atchison, Topeka & Santa Fe Ry. Co. (Mo.) 244 S. W. (2d) 26.

[15]Carter v. Atlanta & St. Andrews Bay Ry. Co. 338 U. S. 430, 70 S. Ct. 226, 94 L. ed. 236; Coray v. Southern Pac. Co. 335 U. S. 520, 69 S. Ct. 275, 93 L. ed. 208; Johnson v. Chicago G. W. Ry. Co. 242 Minn. 130, 64 N. W. (2d) 372.

[16]Coray v. Southern Pac. Co. 335 U. S. 520, 523, 69 S. Ct. 275, 277, 93 L. ed. 208, 210.

[17]See, Louisville & Nashville R. Co. v. Layton, 243 U. S. 617, 37 S. Ct. 456, 61 L. ed. 931; Ross v. Duluth, M. & I. R. Ry. Co. 203 Minn. 312, 281 N. W. 76, 271; Minneapolis & St. L. R. Co. v. Gotschall, 244 U. S. 66, 37 S. Ct. 598, 61 L. ed. 995.

was not actually engaged in coupling or uncoupling cars.[18] The presence or absence of either care or negligence of a defendant carrier is wholly immaterial in establishing liability for a violation of the act.[19] Likewise, the contributory negligence of the injured employee is immaterial unless it is the sole proximate cause of his injury.[20] Upon the evidence herein and in the light of these principles, it is clear that the violation of the act was a proximate cause of plaintiff's injuries.

If we assume that the jury based its verdict on negligence under the Federal Employers' Liability Act, the verdict must nevertheless be sustained since upon the conflicting evidence the jury could reasonably find that defendant's negligence was the sole and proximate cause of plaintiff's injuries.

■ The trial court did not abuse its discretion in refusing to submit to the jury defendant's requested written interrogatories with the appropriate forms for a general verdict. Rule 49.02 of Rules of Civil Procedure provides that:

"The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict."

This portion of the rule is substantially in accord with Minnesota practice prior to the adoption of the rules of civil procedure.[21] Under our prior practice it was discretionary with the trial court to decide whether to submit interrogatories with a general verdict.[22] Federal Rule 49 (b) is identical with our Rule 49.02. In construing Federal Rule 49 (b), the courts have likewise left the submission of

[18]Louisville & Nashville R. Co. v. Layton, 243 U. S. 617, 37 S. Ct. 456, 61 L. ed. 931; Clapper v. Dickinson, 137 Minn. 415, 163 N. W. 752.

[19]O'Donnell v. Elgin, J. & E. Ry. Co. 338 U. S. 384, 70 S. Ct. 200, 94 L. ed. 187; Johnson v. Chicago G. W. Ry. Co. 242 Minn. 130, 64 N. W. (2d) 372.

[20]Carter v. Atlanta & St. Andrews Bay Ry. Co. 338 U. S. 430, 70 S. Ct. 226, 94 L. ed. 236.

[21]See, 2 Youngquist & Blacik, Minnesota Rules Practice, p. 492.

[22]Roske v. Ilykanyics, 232 Minn. 383, 45 N. W. (2d) 769.

written interrogatories in civil jury cases to the judge's discretion.[23] There may be situations in which the refusal to submit written interrogatories would be an abuse of discretion.[24] We find no reason to hold that the trial judge abused his discretion in refusing to submit defendant's requested interrogatories, especially since the record fails to indicate that any prejudice resulted.

■ The charge to the jury did not distinguish and separate the two causes of action as clearly as should have been done; nevertheless, taking the charge as a whole we cannot say that the jury was misled as to either negligence or contributory negligence with respect to either of the causes. Where a claim for relief under the Federal Safety Appliance Act is joined with a negligence action under the Federal Employers' Liability Act, the two causes of action should be clearly distinguished and separated and the court should impress upon the jury the importance of distinguishing between the two causes.[25] The claim arising from a violation of the Federal Safety Appliance Act is in no way dependent upon negligence; whereas, an action brought under the Federal Employers' Liability Act requires a showing of negligence.[26] Under the former, contributory negligence is immaterial unless it is the sole proximate cause of plaintiff's injuries; whereas, under the latter, contributory negligence goes to a proportionate diminution in the amount of damages.[27] Certain issues such as causation and the nature and

[23]Skidmore v. Baltimore & O. R. Co. (2 Cir.) 167 F. (2d) 54.

[24]In 5 Moore, Federal Practice (2 ed.) par. 49.05, it is stated:

"* * * There are cases in which a proper exercise of its discretion under Rule 49 would prompt the trial court to require a special verdict or a general verdict accompanied by interrogatories, such as cases in which complex instructions would otherwise have to be given to the jury, or in which there is a likelihood of costly errors on the part of the court and the jury, or in which the facts to be determined are complicated or technical."

[25]O'Donnell v. Elgin, J. & E. Ry. Co. 338 U. S. 384, 70 S. Ct. 200, 94 L. ed. 187.

[26]*Ibid.*

[27]Tiller v. Atlantic Coast Line R. Co. 318 U. S. 54, 63, 67, 63 S. Ct. 444, 449, 451, 87 L. ed. 610, 615, 617, 143 A. L. R. 967; Johnson v. Chicago G. W. Ry. Co. 242 Minn. 130, 64 N. W. (2d) 372.

extent of the injuries are, however, common to both actions.[28] Taking the charge as a whole, and all charges should be so construed, we find no prejudicial error.

■ Defendant alleges that the trial court erred in excluding the testimony of two witnesses, one of whom, like plaintiff, had sustained a high arm amputation. The testimony of the amputee witness was offered to show that a person who has lost the use of an arm can rehabilitate himself so as to be able to perform gainful employment, do odd jobs, participate in sports, drive a car, and clothe, bathe, and feed himself. The other witness, a beauty supply firm manager, would have testified that the loss of an arm does not of itself disqualify a person from performing work as a salesman of beauty supply products. Although evidence in mitigation of damages is generally admissible in a personal injury suit, no arbitrary rule of evidence can be formulated which is applicable to all situations and much must be left to the sound discretion of the trial court. In a case involving a switchman who had lost two phalanges of his thumb and three of the index finger on his right hand, we have held admissible the testimony of other switchmen—each with similar or greater hand injuries—that they were able to carry on their work as switchmen without much difficulty.[29] Upon the specific issue of whether the loss of certain fingers, or other members, prevents a person from performing the mechanical manipulations required in a certain occupation, the testimony of others similarly handicapped is admissible. Where, however, the disability involves the amputation of an entire limb, and even complications from other injuries, the testimony of witnesses with similar major amputations as to what they are individually able to do in their particular callings is admissible only in the exercise of a sound discretion. In the exercise of that discretion the court may consider a variety of factors such as whether the testimony is only cumulative of what has been otherwise established; whether its evidentiary contribution is too remote or conjectural to have any material probative

[28]O'Donnell v. Elgin, J. & E. Ry. Co. 338 U. S. 384, 70 S. Ct. 200, 94 L. ed. 187.

[29]Baird v. Chicago, M. St. P. & P. R. Co. 179 Minn. 127, 228 N. W. 552.

weight;[30] whether it merely presents a matter of common knowledge with which a jury may be presumed to be familiar;[31] whether it involves a matter of which the court can take judicial notice and declare the truth of the proposition without requiring evidence;[32] and whether between the injured claimant and the proffered witnesses with similar *physical* injuries there exists in other respects—with regard to the performance of the same occupation or other occupations—anything reasonably approaching a common denominator of health, training, personality, ability, and general aptitude. Obviously, by way of example, what the average claimant suffering from a complete loss of eyesight can do by way of rehabilitating himself to perform his usual work, or to perform an entirely new occupation, is not to be measured by the testimony of a Helen Keller. Furthermore, the trial court must weigh the probative value of such testimony against the probability that it will mislead or prejudice the jury.

■ In applying these principles we cannot say that the trial court abused its discretion in excluding the testimony of the amputee witness. Defendant's medical experts had already expressed their opinion that plaintiff could perform the duties of a salesman, watchman, bookkeeper, or of an elevator operator. This testimony was introduced in part to show that plaintiff could engage in gainful employment without the use of his right arm. It follows that the excluded testimony of the amputee was merely corroborative of the doctors' testimony. Since such testimony was cumulative, it was within the discretion of the trial court to exclude it.[33] Furthermore, such testimony presented only a matter of common knowledge. No evidence is required to establish the truth of the proposition that a

[30]See, Watre v. G. N. Ry. Co. 127 Minn. 118, 149 N. W. 18; 7 Dunnell, Dig. (3 ed.) § 3241.

[31]See, O'Conner v. Chicago, R. I. & P. Ry. Co. 144 Iowa 289, 122 N. W. 947; Greenway v. Taylor County, 144 Iowa 332, 122 N. W. 943.

[32]See, 9 Wigmore, Evidence (3 ed.) § 2565; 7 Dunnell, Dig. (3 ed.) § 3448.

[33]Johnson v. Crookston Lbr. Co. 92 Minn. 393, 100 N. W. 225; Mitton v. Cargill Elev. Co. 124 Minn. 65, 144 N. W. 434.

man with only one arm, who is not otherwise disabled and who is otherwise qualified, is able to pursue certain gainful employments such as that of a salesman. On similar grounds we cannot hold that it was an abuse of discretion to exclude the testimony of the beauty supply company manager to the effect that the loss of an arm does not of itself disqualify a person from being a salesman.[34] Insofar as the testimony of the beauty supply manager was offered to show that there is a labor market for a one-arm man as a salesman, assuming plaintiff had no other injuries, it was error without prejudice to exclude such testimony since it is common knowledge that a one-armed person may act as a salesman.

■ The granting of a new trial because of misconduct of the prevailing party, his witnesses, or of his counsel, rests within the discretion of the trial judge and will not be reversed unless there is an abuse of discretion.[35] The trial court is in a much better position than an appellate court to determine whether prejudice resulted.[36] We do not condone improper arguments of counsel or of a litigant's witnesses. The circumstances, however, surrounding the alleged misconduct are not such as to warrant our holding that the trial court abused its discretion in denying a new trial.

■ Defendant contends that excessive damages were awarded under the influence of passion and prejudice. The verdict was for $170,154.81. We turn first to the sole question of whether the verdict is excessive. Plaintiff's average monthly wage before the accident was $450. His loss of wages from the time of the accident to the time of the trial was $3,150. He was 30 years and 8 months of age when injured. According to the U. S. Life Experience Table of Mortality, a man 30 years old has a life expectancy of 38.80 years. Plaintiff has an eighth-grade education. Doctors testified that he might do the

[34]Testimony is admissible to show whether a reasonably stable employment market is available for an employee with certain specified disabilities. See, Lee v. Minneapolis St. Ry. Co. 230 Minn. 315, 41 N. W. (2d) 433.

[35]Willmar Gas Co. Inc. v. Duininck, 239 Minn. 173, 58 N. W. (2d) 197; Ryan v. International Harvester Co. 204 Minn. 177, 283 N. W. 129; 14 Dunnell, Dig. (3 ed.) § 7099b.

[36]Wyatt v. Wyett, 200 Minn. 106, 273 N. W. 600.

work of a watchman, elevator operator, bookkeeper, or a salesman. There was testimony that emotional make-up as well as physical ability is an important factor in considering whether plaintiff could be a salesman.

In personal injury actions it is elementary that the injured party should be made financially *whole* by receiving the monetary equivalent of the harm sustained by him, inclusive of his medical expenses, pain and suffering, past loss of earnings, and, where a permanent injury is inflicted, his future losses due to impaired earning capacity. In arriving at plaintiff's damages for impaired earning capacity, the jury must first determine from the evidence what the plaintiff normally would have earned during the rest of his life had he not been injured, deduct therefrom that sum which he may reasonably be expected to earn despite his injuries, and then reduce the remainder to its present worth.

In the case of permanent injuries, it is necessary, in order to ascertain the damages for impaired earning capacity, to determine the life expectancy of the individual at the time of the tort. For this purpose mortality tables, based on the average life of a large group of persons, have considerable evidentiary value but they are neither decisive of the injured person's life expectancy nor of the number of years his earning capacity would have continued undiminished had he not been injured. These tables are but one of several evidentiary factors to be weighed in ascertaining life expectancy as a preliminary step to the determination of earning expectancy. Life expectancy and earning expectancy are not synonymous since a person may live longer than he is capable of pursuing gainful employment. In determining either of these expectancies, the jury is not permitted to simplify its task by accepting the mortality tables as an unerring guide since the plaintiff's physical condition and health as an individual must also be appraised. Was his physical condition and general health at the time of the tort better or worse than that of the average man of his age? Was he suffering from a serious malady likely to cut his life short or likely to remove him prematurely from the market of gainful employment? Would he have been subject to compulsory retirement at a certain age, and what effect, if any,

would such retirement have had upon his earnings? How soon, if at all, would his earning capacity have been reduced by the infirmities of old age? Considering all his innate qualities, background, and training, what were his future prospects for an increase, or even a decrease, in his earning capacity? All relevant facts, though they be complex, must be considered lest only a part of the damage picture is seen.

Plaintiff's counsel seeks to sustain the amount of the verdict as reasonable by using substantially the same mathematical formula that he used in addressing the jury. This formula assumes that plaintiff's earning expectancy is the same as his life expectancy of 38.80 years. He also assumes that plaintiff would have been able to earn $450 per month for the full life expectancy period. He then calculates the present value of a monthly income of $450 for 38.80 years, at three percent, to be the sum of $124,557.22.[37] Next he deducts from this last figure the total earnings that he conceives plaintiff will earn during such life expectancy despite his injuries. He then assumes, by way of example, that plaintiff in his injured condition may be able to earn only $100 per month or a total of $28,160.87[38] for 38.80 years. After deducting this last figure we have a remainder of $96,396.35 as constituting the amount of damages plaintiff has sustained for loss of future earning capacity.

Counsel then, for illustrative purposes, varies the formula by assuming that plaintiff will earn $150 per month despite his injuries, and calculates his earnings for 38.80 years to be $38,402.41.[39] Deducting this sum from $124,557.22 we have a net remainder of $86,154.81 as the net damages sustained by plaintiff for loss of future earning capacity.

If we deduct from the jury's verdict of $170,154.81 the first figure of $96,396.35 (as damages for loss of future earning capacity) and the further sum of $3,150 (for wages lost between date of injury and

[37]This figure is not correct. Plaintiff's formula, in its inception, proceeds on the erroneous premise that lost future earnings and the proceeds of retained future earning capacity are both to be reduced to present value.

[38]This figure is also erroneous for the reason stated in footnote 37.

[39]This figure is also erroneous for the reason stated in footnote 37.

date of trial) we have a net remainder of $70,608.46 as damages for present and future pain and suffering. On the other hand, if we assume that plaintiff will earn $150 a month despite his injuries and we deduct $86,154.81 (as damages for loss of earning capacity) and also $3,150 (for wages lost up to the time of trial) we have a net remainder of $80,850 for pain and suffering.

Under plaintiff's formula the net remainder, whether it be $70,608.46 or $80,850, necessarily represents damages for pain and suffering. Again, to justify the reasonableness of this amount, another mathematical formula is used which assumes that pain and suffering may be compensated for by the hour or the day. The daily rate being fixed, it is then assumed that the total damages for pain and suffering may be obtained by the simple process of multiplying such rate by the number of days in 38.80 years. Plaintiff argued to the jury that as high as $8 per day would be reasonable for pain and suffering or a total as high as $110,960 for the period of life expectancy.

■ These calculations illustrate how the jury was asked to arrive at its verdict of $170,154.81 and how this court is now asked to find that the verdict is reasonable. The reasonableness of an award for damages can be appraised only in the light of the elementary principle that plaintiff should be given neither more nor less than a sum which leaves him financially *whole* to the same extent as he would have been had no injury occurred. Whether an injured person has been made financially *whole* must be tested by determining what the total amount of damages awarded by the jury will accomplish for him if conserved and used with ordinary prudence.[40] Here we have a verdict of $170,154.81. If this sum is invested at three percent plaintiff will receive in interest alone an annual income of $5,104.64 or slightly less than his regular preinjury income of $5,400. If the money is invested at the reasonable rate of only three and one-fourth percent he will have an annual interest income of $5,530.03 or slightly more than his former income. When his life expectancy expires he will still possess the entire principal sum of $170,154.81.

[40]In Clay v. Chicago, M. & St. P. Ry. Co. 104 Minn. 1, 14, 115 N. W. 949, 955, we recognized that the investment value of a verdict is to be considered in determining the reasonableness of the amount awarded.

Over and above such annual interest income, he will admittedly, despite his injuries, enjoy a retained earning capacity of at least $100 or $150 per month. Such retained earning capacity will in 38.80 years yield him an aggregate sum of $46,560 at $100 per month or $69,840[41] at $150 per month.

Clearly a verdict of $170,154.81 is excessive. If we assume that the interest on such sum will equal his former income of $5,400, as it reasonably should, we find that plaintiff will enjoy for his full life expectancy—*from both retained earning capacity and interest*—a total annual income of either $6,600 or $7,200 per year. Plaintiff, upon the evidence herein, had no prospects for any material increase in his preinjury income. Without such prospects the substantial increase in income cannot be justified unless it is to be treated as compensation for pain and suffering. In addition to an increase from $1,200 to $1,800 per year in income, plaintiff will conclude his life expectancy with an estate of $170,154.81, or the full amount of the verdict. No recognized theory of damages or principle of common sense requires that plaintiff, *over and beyond his damages,* be endowed with an estate at the conclusion of his life expectancy. The income increase and the estate endowment go far beyond any reasonable compensation for pain and suffering. We must ever be careful lest an injured person is not made financially *whole* to the same extent as he would have been had he not been injured, but damages which grossly exceed or fall below full compensation cannot be permitted to stand.

 The segmentation process of breaking the damage picture into fragments and then applying to each fragment a mathematical formula whereby damages are calculated at a fixed rate per day for the entire period of the injured person's life expectancy, though illuminating, may be misleading. An injured person's earning expectancy—both as to duration and amount of income—cannot be ascertained by merely multiplying the number of days in a life expectancy by a fixed rate per day. Many other related and uncertain factors must be considered. Furthermore, pain and suffering

---

[41]As before noted, plaintiff erroneously reduced the amount of the proceeds of retained future earning capacity to its present value. See, footnote 37.

which is subjective and which at its very worst usually varies from day to day cannot, with any finality, be estimated on a daily basis. Usually the jury is asked to use the worst hour or the worst day as a yardstick for evaluating pain. Whatever process is adopted in fixing an injured person's damages, the reasonableness of the lump. sum awarded by the jury must, in the last analysis, also be tested from the unitary standpoint of what total financial benefits that lump sum will confer upon the injured person as a means of making him financially *whole*. No award can be sustained unless it stands the test of reasonableness in the light of its over-all effect.

There is no assurance that plaintiff's future earning capacity, had he. not been injured, would have continued *uninterrupted* and *unimpaired* for his full life expectancy. Normally it would not have done so. Solely by way of illustration, and not as an estimate of lost earning capacity, it is to be noted that slightly less than $90,000 invested on an annuity basis at three percent would permit plaintiff to withdraw therefrom a monthly income of $325 for his entire life expectancy.[42] At whatever figure plaintiff's future income is established as a replacement for lost earning capacity, it is not to be overlooked that in addition to that income he will also receive a valuable and additional benefit in the form of income protection from the misfortunes of unemployment from illness and other causes.

We find no evidence of passion and prejudice by the jury in arriving at its verdict. Apparently the excessive verdict resulted merely from reliance solely upon mathematical formulas without testing the reasonableness of the amount awarded from the standpoint of its over-all effect.

The order appealed from is reversed and a new trial is granted unless, within ten days after the filing of the remittitur in the court below, the plaintiff shall file a written consent that the verdict be reduced to the sum of $105,000. In the event that such consent is filed within the time stated, the order shall be and is affirmed.

Reversed on condition.

---

[42]For annuity value and mortality tables, see 43 M. S. A. pp. 747 to 758; 58 C. J. S., Mortality Tables, pp. 1211, 1212.

UPON PETITION FOR REARGUMENT.

On April 1, 1955, the following opinion was filed:

PER CURIAM.

The petition for reargument is denied in its entirety both as to the request for a new trial on the ground of passion and prejudice and as to the request that the decision be amended to provide specifically that interest shall be allowed only from the date of the filing of the written consent to a reduction of the verdict to $105,000.

Where a new trial is granted unless the plaintiff consents to a reduction in the amount of the verdict to a specific amount, and the plaintiff so consents, he is entitled to interest on the amount of the verdict as reduced from the time the verdict was originally rendered, *unless the mandate of the appellate court clearly excludes such interest.* See, M. S. A. 549.09; Rasmussen v. Milwaukee E. R. & T. Co. 261 Wis. 579, 53 N. W. (2d) 442; Piper v. Epstein, 326 Ill. App. 400, 62 N. E. (2d) 139; Palmer v. Bank of Zumbrota, 72 Minn. 266, 75 N. W. 380; Martin County Bank v. Bird, 90 Minn. 336, 96 N. W. 915. In full recognition of the discretionary power of this court to allow or not to allow interest on a verdict as reduced, we see no reason for modifying the original opinion so as to deny plaintiff his interest on the reduced amount from the time the original verdict was entered.

Petition for reargument denied.