Angeline BUSCH, Respondent,

v.

BUSCH CONSTRUCTION, INC., et al., defendants and third party plaintiffs, Respondents.

GENERAL MOTORS CORPORATION, defendant and third party plaintiff, Appellant,

v.

MAHOWALD MOTORS, INC., third party defendant.

Francis VOHNOUTKA, as Father and Natural Guardian of Mitchell Vohnoutka and Tracy Vohnoutka, et al., Respondents,

v.

Lando Andrew BUSCH, et al., defendants and third party plaintiffs, Respondents,

GENERAL MOTORS CORPORATION, defendant and third party plaintiff, Appellant,

v.

MAHOWALD MOTORS, INC., third party defendant.

Lando Andrew BUSCH, Respondent,

v.

GENERAL MOTORS CORPORATION, Appellant,

Mahowald Motors, Inc., Defendant.

Nos. 47231, 47361.

Supreme Court of Minnesota.

Dec. 9, 1977.

Rehearings Denied Dec. 29, 1977.

Gray, Plant, Mooty, Mooty & Bennett and Richard A. Bowman, Jeffrey R. Brooke and Stephen J. Snyder, Minneapolis, for appellant; Frazer F. Hilder, Gen. Counsel, Thomas W. Watkins, General Motors Corp., Detroit, Mich., of counsel.

Loren M. Barta, New Prague, for Angeline Busch.

Reding & Votel and James Reding, St. Paul, for Busch Const.

Rider, Bennett, Egan, Johnson & Arundel and David F. Fitzgerald and William J. George, Minneapolis, for Vohnoutka.

John M. Smith, Owatonna, for Lando Busch.

YETKA, Justice.

Consolidated appeals from orders denying post-trial motions and from judgments in six personal-injury actions which were tried together arising out of a single-vehicle accident on September 2, 1973. All the plaintiffs were riding in a vehicle driven by Lando Busch, who was both a plaintiff and a defendant in the actions. After a trial of 12 weeks duration, the jury found by special verdict that the product of defendant General Motors Corporation (GM) was defective and that it was an 85-percent cause of the accident and injuries. The jury further found that Lando Busch was negligent and that his negligence was a 15-percent cause of the accident.

Defendant GM filed post-trial motions for judgment notwithstanding the verdict, or a new trial, or damage remittiturs. Defendants Lando Busch and Busch Construction, Inc.[1] filed a post-trial motion for amended findings of fact, conclusions of law and order for judgment and damage remittiturs. The trial court granted new trials on the issue of damages as to three plaintiffs unless they consented to remittiturs. These plaintiffs, Angeline Busch, Lando Busch, and Francis Vohnoutka, consented to the remittiturs, and the motions of defendants GM and Busch were denied.

Defendants appeal from the orders denying their post-trial motions and from the judgment entered October 4, 1976. The three plaintiffs seek review of the order conditionally granting a new trial on the issue of damages unless they consented to remittiturs and the denial of their motions for amended findings of fact, conclusions of law and order for judgment. We affirm.

On September 2, 1973, on Interstate Highway No. 94 (I–94), approximately 12 miles south of Fergus Falls, Minnesota, at about 4:10 p. m., a single vehicle accident occurred. The weather was clear and hot; and the sun had been shining for some time prior to the accident. The eight occupants of the vehicle, a 1973 Chevrolet Suburban Cheyenne Super Ten, were seated in the following positions: Lando Busch was the driver; Dale Busch was in the center-front seat; Francis Vohnoutka was in the front-right seat; Kathleen Vohnoutka was in the center-rear seat; Tracy Vohnoutka was in the right-rear seat; Angeline Busch was in the left-rear seat; and Diane Busch and Mitchell Vohnoutka were in the back, behind the rear seat.

The vehicle was designed and manufactured by GM and owned by Busch Construction, Inc. It is larger than a stationwagon and is sold as a combination passenger-car-

---

1. Defendants Lando Busch and Busch Construction, Inc. will be referred to hereinafter as Busch.

go carrier. At the time of the accident, the vehicle was towing a trailer which held an aluminum fishing boat and motor. The odometer read approximately 12,029 miles.

I–94, a four-lane divided highway with a grass median, has a concrete roadway with 12-foot-wide lanes and 10-foot-wide tar shoulders. It runs east and west at the accident site. The Busch vehicle was traveling in the east bound lane of I–94. The highway curves four or five times, both to the right and left, just before the accident site. The vehicle was entering a curve to the left when it drifted to the right, crossed the shoulder, and struck a paddle marker (a reflector indicating a curve in the road). It then traveled down an embankment, plunged through a freeway fence and landed in a cattail swamp below the highway. The car rolled at least 1½ times and came to rest on its top, having traveled 506 feet from the place where the first marks off the highway appeared.

Plaintiffs and defendant Busch contend that the accident was caused by a defect in the plastic yoke of the turn-signal switch, the part which holds the turn-signal lever. When the lever is moved, the switch, which is inside the steering column, moves. The switch is made of acetal resin plastic (Delrin 500). The turn-signal lever is put into the yoke with a pneumatic screwdriver at the same time the steering-column assembly is completed. Once assembly is completed the turn-signal switch is not accessible without removal of the steering wheel and some other component parts.

When plaintiffs' engineers disassembled the steering column after the accident, a plastic particle was found lodged in the lock-plate housing above the lockpin. It was found to have fractured from the Delrin 500 yoke component of the turn-signal switch. Plaintiffs' expert witnesses claim the plastic particle caused the steering wheel to "lock" or "bind" in the same manner as if the ignition lock had been engaged.

Defendant GM contends that there was no defect and that the accident was caused by the driver's inattention, drowsiness, fall-ing asleep, or failure to brake in time. GM's experts testifying on the issue of defect described tests they performed on the plastic and gave their opinions that the fracture in the Delrin 500 plastic yoke was an impact fracture caused by the accident and not a fatigue fracture and that even if a piece of plastic was lodged in the steering mechanism, it would not bind the steering. The testimony offered by GM, through the investigating highway patrol troopers Kunz and Kamrowski, and GM's expert on single-car, "fall-asleep" accident characteristics, was rejected by the trial court, ruling that falling asleep at the wheel was a matter of common knowledge. The investigating troopers testified that they found none of the characteristic markings made by a braking vehicle. Further, part of the testimony of one of GM's experts on braking times and distances was rejected.

The jury found by special verdict as follows:

"1) Was the 1973 Chevrolet Suburban in a defective condition unreasonably dangerous to the users of the vehicle?

"Yes
(yes or no)

(If your answer to question # 1 is 'yes', then answer question # 2)

"2) Was such condition a direct cause of the accident of September 2, 1973, and the resulting injuries?

"Yes
(yes or no)

"3) Was the defendant Lando Busch negligent in the operation of the 1973 Chevrolet Suburban?

"Yes
(yes or no)

(If your answer to question # 3 is 'yes', then answer question # 4)

"4) Was the defendant Lando Busch's negligence a direct cause of the accident of September 2, 1973, and the resulting injuries?

"Yes
(yes or no)

"5) If you find by your answers to questions # 2 and # 4 that the conduct

of more than one of the parties was a direct cause of the September 2, 1973, accident, then answer this question:

Taking the combined fault that caused the accident at 100%, what percentage of the fault is attributable to:

| General Motors Corp. | 85% |
|---|---|
| Lando Busch | 15% |
| Total | 100% |

"(Regardless of whether or how you answered the foregoing five questions, you must answer each of the following questions.)

"6) What was the total amount of the damages sustained by the plaintiff Angeline Busch as a result of the accident of September 2, 1973?

$1,800,000.00

A) Of this amount, what part is attributable to the cost of her future medical expense and future attendant care for her lifetime?

$1,000,000.00

"7) What was the total amount of the damages sustained by the plaintiff Lando Busch as a result of the accident of September 2, 1973?

$608,500.00

"8) What was the total amount of the damages sustained by the plaintiff Francis Vohnoutka as a result of the accident of September 2, 1973?

$250,000.00

"9) What was the total amount of the damages sustained by the plaintiff Kathleen Vohnoutka as a result of the accident of September 2, 1973?

$75,000.00

"10) What was the total amount of the damages sustained by the plaintiff Tracy Vohnoutka as a result of the accident of September 2, 1973?

$18,000.00

A) Of this amount, what part is attributable to her personal medical expense, past and future?

$3,000.00

"11) What was the total amount of the damages sustained by the plaintiff Mitchell Vohnoutka as a result of the accident of September 2, 1973?

$14,000.00

A) Of this amount, what part is attributable to his personal medical expense, past and future?

$4,000.00"

The post-trial motions for a new trial were denied after three of the plaintiffs consented to the following remittiturs: Angeline Busch's damages were reduced by $275,000, Lando Busch's by $135,400, and Francis Vohnoutka's by $54,808. The final judgments entered October 4, 1976, found defendants Busch and GM jointly and severally liable to all plaintiffs except Lando Busch, reduced the amount of damages awarded to Lando Busch by 15 percent, the percentage of negligence which the jury found he had contributed to the cause of the accident, and ordered contribution between Busch and GM for any amounts paid which were greater than the percentage of fault attributed to them.

The parties have raised numerous issues and argued them vigorously. Summarized and consolidated, these issues are as follows:

(1) Was the exclusion of GM's expert testimony on the characteristics of "fall-asleep" accidents and braking times and distances erroneously based on the theory of "curative admissibility" or, in the alternative, was the exclusion an abuse of the trial court's discretion?

(2) Did the trial court erroneously admit evidence of unrelated, pre-accident steering difficulties which Lando Busch had experienced with this vehicle and failures of turn-signal switches in other vehicles?

(3) Was there sufficient evidence to support the jury's finding that the vehicle was defective and that the accident was caused by the defect?

(4) Did the trial court correctly compare the causal contribution of a negligent driver with the strict liability of the manufacturer of a defective vehicle?

(5) The following issues with respect to the damages awarded are also raised:

(a) Was an expert properly allowed to testify as to inflation factors?

(b) Was the trial court's instruction on discounting future medical damages adequate?

(c) Were the damage awards excessive?

(d) Were the remittiturs ordered by the court proper?

(e) Was the court correct in awarding Angeline Busch, as opposed to Lando Busch, damages for Angeline Busch's future medical care?

1. *Exclusion of certain testimony by GM's experts.*

Defendant GM contends that it was wholly precluded by erroneous trial court rulings from presenting its affirmative defense of a driver-error theory of causation and that because of these rulings it could not make a completely effective defense on the issue of whether the vehicle was defective.

One of GM's experts, Kenneth Orlowski, was not permitted to show portions of a film of braking tests performed at the scene 3 years after the accident.[2] He would have testified to normal braking times and distances. The evidence was rejected as irrelevant and perhaps on foundational grounds as well. The record is not clear. He was, however, permitted to show those portions of the film which depicted the area involved, and he was allowed to testify to his reconstruction of the vehicle's path from its departure from the highway to its resting spot.

J. Stannard Baker's proffered expert testimony was also excluded by the trial court. Baker would have testified that he was an experienced traffic engineer. He would have testified about driver-complex-reaction times in emergencies and about studies which bear on a driver's ability to stop a vehicle in a given time. He would have

explained studies done by himself and others on single car accidents, the results of which show common assumptions regarding single-car, "fall-asleep" accidents, especially concerning the conditions preceding such accidents, are often mistaken. Finally, he would have given his opinion, based on the time of day, absence of brake marks, angle of leaving the road, and consumption of a small amount of 3.2 beer, that Lando Busch fell asleep and that the accident was not a result of a vehicle defect. The trial court ruled that falling asleep at the wheel was not a proper subject for expert testimony and refused the offer of proof.[3]

Contrary to its claim, GM was allowed to extensively litigate the issue of whether the turn-signal switch was defective. GM's experts, who gave more than 1800 pages of testimony, disagreed with plaintiffs' experts on the issues of whether the turn-signal switch broke through fatigue or impact and whether the plastic fragment could cause the steering column to lock. GM advances two theoretical grounds for its contention that the exclusion of its expert testimony was error: (a) curative admissibility, and (b) independent admissibility and abuse of discretion.

 a. *Curative Admissibility.* The doctrine of curative admissibility allows a party to present otherwise inadmissible evidence on an evidentiary point where an opponent has "opened the door" by introducing similarly inadmissible evidence on the same point. The doctrine is recognized in both 1 Wigmore, Evidence (3 ed.) § 15, and McCormick, Evidence (2 ed.) § 57. There is, however, disagreement on what criteria must be met before the doctrine can be applied. The major cases are in conflict as to whether making an objection and thus

---

2. The tests were made in March 1976 with a 1976 model vehicle and at a different time of year. Orlowski would have testified that the brakes were of the same design as the 1973 vehicle involved in the accident.

3. Although defendant characterized this as total rejection of Baker's testimony, the offer of proof also concerned complex reaction times and emergency reactions. The court rejected

Baker's testimony on the ground that the testimony about falling asleep was not a proper subject for expert testimony. The same ruling was made with regard to the highway patrol troopers' testimony on characteristics of "fall-asleep" accidents. No ruling was made regarding Baker's qualifications on complex reaction times or other factual data.

preserving the error for review is a prerequisite or a bar to the application of the doctrine. Minnesota recognizes the doctrine but has not used the term "curative admissibility." The Minnesota cases do not make lack of objection a crucial consideration.

In *McNab v. Jeppesen*, 258 Minn. 15, 102 N.W.2d 709 (1960), inadmissible expert opinion testimony on the point of vehicle impact in an automobile accident was elicited by a defendant on cross-examination and objected to on the incorrect ground of lack of foundation only. This court held that it was reversible error to refuse to admit plaintiff's otherwise inadmissible expert testimony on the same point. In *Williams v. Hoyt Construction Co., Inc.*, 306 Minn. 59, 71, 237 N.W.2d 339, 347 (1975), this court explained *McNab* as follows:

> " * * * [*McNab*] does not establish a doctrine of 'fair play' which would permit a party to introduce whatever incompetent evidence it desires by the simple expedient of failing to object to the introduction of incompetent evidence by the opposing party. Rather, the decision holds only that where inadmissible opinion testimony has been admitted and must be given probative force by the jury, the trial court must permit the party adversely affected by such testimony to introduce similarly inadmissible testimony to rebut it."

In order to be entitled as a matter of right to present rebutting evidence on an evidentiary fact: (a) the original evidence must be inadmissible and prejudicial, (b) the rebuttal evidence must be similarly inadmissible, and (c) the rebuttal evidence must be limited to the same evidentiary fact as the original inadmissible evidence.[4] If the original evidence is admissible or nonprejudicial, or if the rebuttal evidence is inadmissible because of a different exclusionary rule, the issue is addressed to the trial court's discretion.[5]

■ Much of GM's argument is based on its contention that the trial court's rulings were not evenhanded. Williams makes it clear that curative admissibility, as developed in Minnesota, is not merely a "fair play" doctrine. If the trial court was arbitrary or one-sided in its rulings, then its rulings against GM would be an abuse of discretion. It should be noted, however, that almost every controverted evidentiary point was the subject of an in-chambers discussion and the trial court appears to have carefully considered its rulings.

GM cites several specific examples of testimony which it claims to be inadmissible and prejudicial and which thus "open the door" to admission of its expert testimony on "fall-asleep" accidents, braking, and reaction times.

■ Kathleen Vohnoutka, the passenger seated in the center-rear seat, was permitted to testify, over objection, that Lando Busch was "trying" to turn the wheel and that he "wanted" to turn the wheel during the plunge down the hill.[6] GM objected in

---

4. If the original evidence is admissible on all grounds, then the only objection which is precluded by doctrine of curative admissibility is relevance. Objections to foundation, hearsay, and improper opinion are preserved. If a piece of evidence, inadmissible on a particular ground, is nonetheless admitted, the party offering the original evidence may not complain about relevant rebuttal evidence which would otherwise be inadmissible on that same ground.

5. In the recent case of *Helm v. El Rehbein and Son, Inc.*, Minn., 257 N.W.2d 584 (1977), we upheld the trial court's exercise of discretion in admitting certain evidence in the form of lay testimony elicited from plaintiff to rebut his own expert. Although we relied upon a broader statement of the rule found in *Albertson v.*

*Chicago, Milwaukee, St. Paul and Pacific R. Co.*, 242 Minn. 50, 58, 64 N.W.2d 175, 181 (1954), we also noted that the evidence was relevant and admissible in itself and that no objection had been made at trial.

6. The relevant testimony is as follows:

"Q Kathy, would you tell us if you would in your own words what it was at the point as you left the road, the things that you saw? Would you tell us that?

"A What I saw was Ange was sitting forward. She had her left arm on the back of the front seat behind Lando. Lando, he had his—I could see his arm, this part of his arm (Indicating) and it was, it was just very big, just very tense. I could see the bow of this side of his glasses and his face was just huge. This cord

chambers to this testimony as conclusory, but the court ruled that it was a blend of fact and opinion. At trial, the questioning was objected to as leading, suggestive, and repetitious. In *State v. Hines*, 270 Minn. 30, 37, 133 N.W.2d 371, 376 (1964), the court ruled that it was error to allow a witness to testify about the defendant's subjective intent. However, the court indicated that a question, like the one in the present case, regarding the witness' impression, would be acceptable. McCormick, Evidence (2 ed.) § 11, states that the important factor in admitting lay opinions is to get the facts on which the opinion is based before the jury. Although the opinion in this instance may have been superfluous, the jury heard the witness testify about her observations, upon which her opinion was based. Additionally, the testimony was elicited to show whether there was a lock in the steering column. This evidence did not require the trial court to admit expert testimony regarding "fall-asleep" accidents simply because the testimony was incidentally relevant to whether Lando Busch fell asleep. Different evidential facts were proved, and the rebutting evidence was of a radically different character.

Lando Busch testified that he had no memory of the events leading up to the accident. Nonetheless, on cross-examination by counsel for the Vohnoutkas, he was permitted to testify that he did not fall asleep because he never fell asleep. An objection and motion to strike were made and granted.

Even if the court was required to admit some rebuttal on this point, it was not required to admit expert testimony. The proper rebuttal for this testimony would have been direct or other circumstantial evidence that Mr. Busch had fallen asleep while driving. When expert opinion testimony based primarily on statistical studies is offered to rebut lay testimony, great care should be used.[7] GM's counsel had the opportunity both on cross-examination and in closing argument to emphasize Mr. Busch's lack of memory and to obviate any prejudice.

GM further argues that the admission of certain opinions by Dr. S. C. Uzgiris, one of plaintiffs' experts, was erroneous and thus "opened the door" to GM's expert testimony on a different theory of causation. Dr. Uzgiris stated his opinion that a binding in the steering column caused by a piece of plastic was a competent producing cause of the vehicle being driven off the highway. GM's objection to foundation was overruled. The opinion was based on experiments performed by Dr. Uzgiris on similar steering columns and his examination of the steering column in the Busch vehicle. He also gave his opinion that the steering column was defectively designed.

"Q Could you tell what he was trying to do from what you observed, what did it look like to you?

"A He was trying to turn to me. He was, he was just, he wanted to turn it so bad so we wouldn't hit, so we wouldn't crash. I just won't forget it."

7. See, *People v. Collins*, 68 Cal.2d 319, 66 Cal. Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176 (1968), in which a criminal conviction based primarily on a statistical prediction was reversed. Although the *Collins* case involved a direct prediction of a statistical probability of guilt in a criminal case, the discussion of the problems involved with foundations for statistics is instructive, especially here, where the foundation for expert testimony is likely to be hidden by the studies done by persons other than the witness.

in his neck, it was just so, so big, just like it was going to burst. He was just, he wanted to—he was just struggling. He was just like when—I have seen him, I have been fishing with him, I have seen him lift a heavy gas tank. He was just straining, just—he was so big, his neck was so big. I just won't ever forget it."

She was also asked the following question:

"Q Kathy, from your experience both as a driver and riding in cars and the number of times that you have also ridden with Lando, could you describe for the jury as to what it looked to you like he was doing at this particular moment that you saw him?

"A The best way I can describe as I saw Lando with his arm and his neck, the position he was in is just like a turtle pulling his head into the shell. He was just so, so humped up, his arm and his neck. He was just so struggling. It was just like a turtle pulling its head into the shell.

The opinions of an expert bearing on the ultimate facts of defect and cause are admissible in the sound discretion of the trial court, provided a strong foundation for such testimony is laid. See, *Gardner v. Coca-Cola Bottling Co.*, 267 Minn. 505, 513, 127 N.W.2d 557, 563 (1964). In the present case, Dr. Uzgiris' opinion concerning the design of the steering column and the cause of the accident were based on sufficient factual data and first-hand experiments and, in light of the complexity of the issue, were of assistance to the triers of fact. *LeMieux v. Bishop*, 296 Minn. 372, 378, 209 N.W.2d 379, 383 (1973); *Dunshee v. Douglas*, Minn., 255 N.W.2d 42, 47 (1977).

Thus, the testimony of Dr. Uzgiris on defect and causation was admissible in the court's discretion, and the doctrine of curative admissibility does not require rebuttal. The exclusion of GM's expert testimony must be considered an exercise of the trial court's discretion.

Another difficulty in applying the curative admissibility doctrine to this excluded evidence is the fact that the evidential point to be proved on rebuttal was not the same as the original point. The testimony given by Dr. Uzgiris related to the facts of defective design and a broken piece of plastic causing binding in the steering column. GM's experts, Carl Melander, Alan Thebert, Fulton Holtby, and Professor F. J. McGarry, gave extensive testimony on those issues. While Baker's testimony would have been generally on the issue of causation, it would not have been limited to the same evidential facts, and the exclusion of the Baker testimony was still discretionary.

Dr. Uzgiris also gave his opinion as to how a person reacts if he finds himself driving at a high speed and the steering binds: "[H]e goes into a thinking process or a panic or whatever. He realizes that something is going haywire. I tested myself on that point." GM's objection as to

vagueness was overruled. If this statement is characterized as expert opinion, then it is without foundation and probably prejudicial. So characterized, it at least "opens the door" to rebutting expert testimony on emergency reactions. Baker would have offered testimony on complex reaction times and should have been allowed to testify on those issues. We do not believe, however, that the trial court's ruling precluded all of Baker's testimony, and we believe that GM prejudiced itself by misconstruing the court's ruling. We find that the trial court did not rule on Baker's qualifications or testimony in the area of complex reaction times and emergency reactions. Had the trial court found him qualified, exclusion of that testimony would have been error. In addition, where an offer of proof contains both admissible and inadmissible evidence and the trial court rejects the entire offer, it is incumbent upon the offeror, and not the judge, to select the admissible part. McCormick, Evidence (2 ed.) § 51; see, *Wilson Storage & Transfer Co. v. Geurkink*, 242 Minn. 60, 68, 64 N.W.2d 9, 15 (1954).

The exclusion of the testimony on complex reaction times did not, in any event, prejudice GM. The jury's finding that Lando Busch was 15-percent negligent was most likely based on the jury's belief that he failed to brake in time.[8]

GM also claims that testimony about the restful night preceding the accident and about air conditioning in the car was "anticipatory rebuttal" of its expert testimony. Certainly, the evidence on the presence of air conditioning is relevant to describe the vehicle's condition at the time of the accident, even if Baker would have testified that statistical studies show that people fall asleep even with the air conditioning on. In addition, testimony about Lando Busch's restful weekend was rele-

8. The jury was provided with several reconstructions of the vehicle's path after it left the roadway and started on the shoulder. The highway patrolmen found no skid or braking marks on the concrete, asphalt, or grass shoulder. The distance from the first tire mark to the paddle marker was about 105 feet. The jury could have determined from this evidence that there was sufficient braking distance and that the failure to brake was negligent. The brakes were working at the time of the accident.

vant to the issue of his negligence. None of the parties disputes the relevance of evidence on the issue of whether Lando Busch was drowsy or inattentive. Since the original evidence was relevant and admissible, the admission of the Baker testimony cannot be had as a matter of right.

GM further contends that the admission of certain opinion testimony by troopers Kunz and Kamrowski, the investigating officers, concerning alcohol consumption and the marks made by a braking vehicle entitled GM to introduce rebuttal testimony. Since GM does not claim the troopers' testimony was inadmissible, the curative admissibility doctrine does not apply, and the trial court in its discretion could still exclude the expert testimony. GM elicited the testimony regarding Lando Busch's alcohol consumption over strong objection. It cannot now claim this evidence as a ground for allowing additional testimony.

Finally, GM claims that admission of testimony concerning Lando Busch's driving and sleeping habits was erroneous, prejudicial, and entitled it to introduce expert testimony in rebuttal. Baker would have testified it was his opinion that whether a driver was rested or had a prior history of falling asleep is irrelevant in "fall-asleep," single-car accidents.

There was a considerable amount of testimony from the passengers concerning their opinions of Lando Busch's driving habits. Since GM had raised the issue of assumption of the risk as an affirmative defense, the opinions and knowledge of the passengers were relevant. Assumption of the risk involves a voluntary and unreasonable encounter with a known danger and is a form of contributory negligence. *Springrose v. Willmore*, 292 Minn. 23, 192 N.W.2d 826 (1971). The plaintiffs' beliefs as to Lando Busch's driving habits and abilities were relevant to this issue and were thus admissible.

The challenged testimony is properly characterized as "habit" evidence. Although we have not been receptive in the past to evidence of driving habits, *Ryan v. International Harvester Co.*, 204 Minn. 177, 182, 283 N.W. 129, 131 (1938), but cf. *Sauke v. Bird*, 267 Minn. 129, 133, 125 N.W.2d 421, 424 (1963), we hold that an adequate foundation was laid for the admission of Lando Busch's testimony about his driving habits on long trips and his habits in towing the trailer. As with the other evidence, this testimony did not require the trial court to admit expert opinion in rebuttal.

Thus, the doctrine of curative admissibility, as applied to this case, did not entitle GM to present expert testimony as a matter of right on the characteristics of "fall-asleep" accidents. The evidence which it was intended to rebut was either admissible, non-prejudicial, or of a sufficiently different character so as to make the admissibility of Baker's testimony a matter within the trial court's discretion.

The same reasoning applies to the testimony of Orlowski on braking times and distances. Although evidence of available time and opportunity to stop is always relevant to driver negligence, *Medved v. Doolittle*, 220 Minn. 352, 19 N.W.2d 788 (1945) and *Sims v. Hallett Construction Co.*, 247 Minn. 339, 77 N.W.2d 54 (1956), expert testimony is not required.[9]

b. *Abuse of discretion.* In examining all of the facts of this case, we do not find that the trial court abused its discretion in excluding the expert testimony by Baker and Orlowski. In light of the fact that the jury's assessment of 15-percent causal negligence against Lando Busch was most likely based on its finding that he could have braked but failed to do so, any error in excluding the testimony of Orlowski was harmless.

In *Dunshee v. Douglas*, Minn., 255 N.W.2d 42, we reaffirmed our position that the admissibility of testimony of accident

---

**9.** Although the exclusion of Orlowski's testimony on relevance grounds was incorrect, we will uphold the exclusion because it was excludable in the trial court's discretion. See, 1 Wigmore, · Evidence, § 18, p. 342.

reconstructionists is discretionary. Because Baker did not do a first-hand investigation of the accident and because of the fundamentally statistical nature of his testimony, the trial court's exclusion of that portion of the testimony regarding "fall-asleep" accidents was within its discretion.[10]

There is some doubt as to whether GM could have laid a foundation for Baker's testimony in any case. Insofar as it would have been based upon that portion of Orlowski's reconstruction of the vehicle's path, which was properly excluded, foundation for Baker's opinion would be lacking.

We finally note that after concluding its instructions to the jury, the trial court, at the request of GM and over objections of the other litigants, told the jury to consider all the issues, such as the locking of the steering column, and further stated:

> " * * * I am advising you that on the issue of whether or not a driver of the vehicle went to sleep, you will consider all of the evidence in the case, both direct and circumstantial, in resolving that issue."

This instruction, given to the jury just before it retired, served to reemphasize GM's claims.

2. *Admission into evidence of unrelated preaccident steering difficulties and other turn-signal switch failures.*

■ a. *Preaccident steering difficulties.* Several months prior to the accident, Lando Busch experienced two or three instances of steering looseness in the vehicle. The cause was found to be loose bolts which were repaired by the dealer, Mahowald Motors. After the accident the bolts were found to be tight and admittedly did not cause the accident.

In a pretrial motion, GM attempted to preclude introduction of evidence of the steering looseness and the recall campaign which it occasioned. After extensive, in-chambers discussion, the trial court excluded evidence of the recall campaign, but overruled the motion as to steering loose-

ness. GM objected throughout the trial to the testimony on steering looseness and requested curative instructions. At one point GM moved for a mistrial. Although the court invited GM to renew its request for instructions, the request was denied on the ground that the issue had been adequately covered by counsel.

The initial trial court ruling was influenced by *Moraca v. Ford Motor Co.*, 66 N.J. 454, 332 A.2d 599 (1975). *Moraca* held that proof of a specific defect is not necessary in a products liability case where there is circumstantial evidence on which to base a finding. But we do not believe that the *Moraca* case permits introduction of evidence of unrelated defects where there is no claim that they caused the accident.

*Marocco v. Ford Motor Co.*, 7 Cal.App.3d 84, 86 Cal.Rptr. 526 (1970), was a products liability, automobile accident case in which the court held that it was error to admit a government report which discussed defects in an automobile when such defects were admittedly unrelated to the defect which was claimed to have caused the accident. However, the court in *Marocco* found that the error was not prejudicial because there was other sufficient credible evidence to support the finding of defect.

In light of the admission that looseness was not a steering defect issue, it was error not to give curative instructions. However, admission that the defect had been corrected and the arguments counsel made to that effect are sufficient to show that GM was not prejudiced on this theory. Additionally, there was sufficient evidence of the actual defect to make this error harmless.

We should again emphasize that GM objected, and its objection was sustained, to evidence that GM had recalled a number of vehicles because of steering defects.

■ b. *Other switch failures.* Over foundation and relevancy objections, plaintiffs were allowed to question Dr. Uzgiris about other fractured turn-signal switches which he had seen. Dr. Uzgiris testified

---

**10.** Rules 702 to 704, Minnesota Rules of Evidence, not yet in effect when this case was decided, liberalize the criteria for admission of expert testimony.

that he had other broken switches in his possession and that his opinion that the switch and steering column designs were defective was based, in part, on these other switches. However, he testified later that consideration of these switches was unnecessary to his opinion, and the trial court precluded further questions on the issue. Thus, no prejudice to GM resulted.

### 3. *Sufficiency of the evidence.*

GM contends that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict. It claims plaintiffs' evidence failed to establish even a prima facie case on the issues of the fatigue failure of the switch and the causal connection between the broken piece of plastic and the accident. These issues were the subject of over 20 days of testimony and in-chambers argument.

The standard of review on a motion notwithstanding the verdict is well settled in Minnesota. In *Fulsom v. Egner*, 248 Minn. 156, 158, 79 N.W.2d 25, 28 (1956), this court said:

> " * * * [T]he rule in this state is that a motion for judgment notwithstanding the verdict will be granted only when the evidence is conclusive against the verdict. *Trovatten v. Hanson*, 171 Minn. 130, 213 N.W. 536. Such a motion accepts the view of the evidence most favorable to the verdict and admits every inference reasonably to be drawn from such evidence as well as the credibility of the testimony for the adverse party. If the application of this rule in the light of the evidence as a whole discloses a reasonable basis for the verdict the motion will be denied. *Mayzlik v. Lansing Elev. Co.*, 241 Minn. 468, 63 N.W.2d 380. In other words, a verdict must be accepted as final by both the trial court and the Supreme Court if it has reasonable support in the evidence. *Peterson v. Jewel Tea Co. Inc.*, 228 Minn. 521, 38 N.W.2d 51."

See, also, *Seidl v. Trollhaugen, Inc.*, 305 Minn. 506, 232 N.W.2d 236 (1975); *Waite v. American Creosote Works, Inc.*, 295 Minn. 288, 204 N.W.2d 410 (1973). Additionally, this court held that conflicts in expert testimony must be resolved by the jury. *Gardner v. Coca-Cola Bottling Co.*, 267 Minn. 505, 510, 127 N.W.2d 557, 561; *Smith v. Rekucki*, 287 Minn. 149, 154, 177 N.W.2d 410, 414 (1970). With these principles in mind, the jury's findings of defect and causation are amply supported by the evidence. The qualifications of both plaintiffs' and GM's experts who testified on the issues of defect and causation were presented at length and apparently not seriously challenged by any of the parties at trial.

GM argues in its brief that the scientific evidence compels the conclusion that the turn-signal switch broke under impact and not through fatigue. Plaintiffs' witness, Dr. Lawrence J. Broutman, gave his opinion that the plastic switch had fractured from fatigue prior to the accident. He based this opinion on factors involved in the molding process and the fact that the turn-signal lever was larger than GM's specifications, therefore creating extra stresses in the plastic. He testified that the part was not designed or fabricated in accordance with good engineering practice. His opinions were based upon extensive testing and experience.

Some of the testimony by GM's experts on cross-examination also lends support to the finding of a defect. Alan Thebert, a GM employee, testified that if he had had quality-control responsibility for the turn-signal lever, he would have rejected it because of its failure to meet specifications.

Dr. Uzgiris testified that the design of the steering column was defective and that the fractured piece of plastic was a competent producing cause of the vehicle being driven off the highway. Based on the tests he performed, he testified that the fractured plastic particle would cause binding 1 percent of the time. This testimony, combined with the Broutman testimony on the specific defect in the turn signal of the Busch vehicle, would be sufficient to support the verdict.

There is testimony from a GM design engineer, Carl Melander, about a turn-sig-

nal failure and yoke fracture which he had seen in a similar turn-signal switch.[11] He also agreed on cross-examination that it would be prudent to remove plastic particles that were loose in the steering column because of the danger of steering binding.

The lay testimony of Francis and Kathleen Vohnoutka about Lando Busch's struggles with the wheel, and the testimony of trooper Kunz, and Roger Sjerve, the tow-truck operator, both of whom came upon the scene shortly after the accident, that the wheels would not turn, also support the jury's finding of a defect in the steering column.

There is no challenge to the finding that Lando Busch was negligent. The jury could have found that he failed to brake properly despite the availability of sufficient time before the vehicle began to turn over.

### 4. Comparative Negligence.

The jury found that the defective vehicle produced by GM was an 85-percent contributing cause of the accident and that Lando Busch's negligence was a 15-percent cause. After considering several post-trial motions, the trial court ordered that as a plaintiff, Lando Busch's recovery against GM be reduced by 15 percent and that as a defendant, Busch be held jointly and severally liable with defendant GM. The trial court ordered contribution between the codefendants in proportion to their respective fault percentages and denied Busch's motion for full indemnity. The parties raise the issue of whether comparative fault concepts should apply to this case in light of the fact that GM was found to be strictly liable under principles of Restatement, Torts 2d, § 402A, and Lando Busch was found to be liable on an ordinary

negligence theory. Because Lando Busch was both a plaintiff and a defendant, the issue raised is twofold: (1) May the ordinary contributory negligence of a plaintiff be compared with the strict liability of a defendant under Minn.St. 604.01? (2) May the strict liability of one codefendant be compared with the ordinary negligence of another codefendant for purposes of contribution under Minn.St. 604.01?

The Wisconsin Supreme Court in *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967), adopted a cause of action for strict liability in tort under Restatement, Torts 2d, § 402A. The Wisconsin Supreme Court further held that its comparative negligence statute applied to such actions. In *Marier v. Memorial Rescue Service, Inc.*, 296 Minn. 242, 207 N.W.2d 706 (1973), we held that our adoption of the Wisconsin comparative negligence statute presumed our adoption of the Wisconsin Supreme Court's interpretations of the statute up to that point. We therefore adopt the Wisconsin rule that the comparative negligence statute applies in actions brought on a § 402A theory,[12] and we affirm the trial court on its application in this case.

Although the emphasis in the Wisconsin cases has been on the problems of proof involved in negligence actions against manufacturers, *Dippel v. Sciano, supra*, recognizes that consumer protection and the shifting of the risk of loss are also important policy considerations, 37 Wis.2d 450, 155 N.W.2d 58. Cf. *McCormack v. Hankscraft Co. Inc.*, 278 Minn. 322, 338, 154 N.W.2d 488, 500 (1967), and *Farr v. Armstrong Rubber Co.*, 288 Minn. 83, 179 N.W.2d 64 (1970). The two policies are consistent because by reducing the necessary elements of proof the risks of loss shift to the distributor.[13] We also note that the

---

11. Although Mr. Melander called the fracture that he saw an impact fracture, it had few of the earmarks of an impact fracture and the automobile in which it was found had not been in an accident.

12. The use of the term "negligence" in the statute is not a bar to its application in strict liability cases. In addition to *Dippel v. Sciano*, in *Springrose v. Willmore*, 292 Minn. 23, 192

N.W.2d 826 (1971), we included the defense of assumption of the risk within our comparative negligence statute.

13. We are not bound by the Wisconsin Supreme Court's analysis of available defenses in products liability actions because no question of statutory interpretation is involved. *Moteberg v. Johnson*, 297 Minn. 28, 33, 210 N.W.2d 27, 31 (1973). Thus, we do not adopt the rea-

policy embodied in our comparative negligence statute of shifting some of the risk of loss away from negligent plaintiffs is consistent with the same policy found in § 402A.

Our adoption of comparative fault concepts in strict liability actions finds support in other jurisdictions and in a growing body of commentary.[14] We find no difficulty in applying comparative concepts to products liability cases. As pointed out in Jensvold, *A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases*, 58 Minn.L.Rev. 723, 725, comparative *negligence* is a misnomer:

> " * * * [T]he comparative negligence statute becomes more than a comparative *negligence* or even a comparative *fault* statute; it becomes a comparative *cause* statute under which all independent and concurrent causes of an accident may be apportioned on a percentage basis."

Cf. 2 William Mitchell L.Rev. 235, 250. We recognized the validity of this type of analysis in a context limited to negligence in *Winge v. Minnesota Transfer Railway Co.*, 294 Minn. 399, 403, 201 N.W.2d 259, 263 (1972). See, also, *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 603 (D. Idaho 1976).

One additional problem remains with the application of comparative fault concepts in products liability cases: What types of conduct by a user should constitute the kind of contributory fault which is to be compared with a distributor's strict liability? This problem is compounded by the fact that our prior cases have not been clear on what defenses are available in § 402A actions.[15] 2 William Mitchell L.Rev. 235, 251, suggests that any solution to this issue must be tailored to protect the consumer's reliance on the product's safety. To insure protection of this interest, we hold that a consumer's negligent failure to inspect a product or to guard against defects is not a defense and thus may not be compared with a distributor's strict liability. All other types of consumer negligence, misuse, or assumption of the risk must be compared with the distributor's strict liability under the statute.[16]

On the facts of the present case, we find that the jury could have found that Lando Busch's conduct constituted more than mere failure to inspect a product or guard against the existence of a defect. Further, the court gave the jury an instruction on standard of care in an emergency. Thus, the court correctly submitted the issue of comparative fault to the jury and awarded contribution between the codefendants based upon the jury's findings of their respective fault percentages.[17]

---

soning of the Wisconsin decisions which imply that a distributor can avoid liability by proving it was not negligent. Cf. *Greiten v. LaDow*, 70 Wis.2d 589, 601, 235 N.W.2d 677, 684 (1975) (Heffernan, J., concurring).

14. *General Motors Corp. v. Hopkins*, 548 S.W.2d 344, 349 (Tex.1977); *West v. Caterpillar Tractor Co., Inc.*, 336 So.2d 80, 90 (Fla. 1976); *Butaud v. Suburban Marine & Sporting Goods, Inc.*, 555 P.2d 42, 43 (Alaska 1976); *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 603 (D. Idaho 1976) (applying Idaho law); *Rodrigues v. Ripley Industries, Inc.*, 507 F.2d 782 (1 Cir. 1974) (applying New Hampshire law); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 290 (5 Cir. 1975) (applying Mississippi law); Jensvold, *A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases*, 58 Minn.L.Rev. 723; 2 William Mitchell L.Rev. 235; Schwartz, *Strict Liability and Comparative Negligence*, 42 Tenn.L.Rev. 171; and Vol. II, Interagency Task

Force on Product Liability, U. S. Dept. of Commerce (1977) pp. 88 to 123.

15. Compare the majority and concurring opinions in *Magnuson v. Rupp Manufacturing, Inc.*, 285 Minn. 32, 171 N.W.2d 201 (1969), and *Lee v. Crookston Coca-Cola Bottling Co.*, 290 Minn. 321, 188 N.W.2d 426 (1971).

16. Thus we adopt Restatement, Torts 2d, § 402A, comment *n*, only insofar as it removes the failure to inspect a product as a defense. In all other cases, plaintiff is not absolutely barred from recovery, but comparative fault concepts will apply.

17. Under our decision today, the concerns of the dissenting justices in *Tolbert v. Gerber Industries, Inc.*, Minn., 255 N.W.2d 362 (1977), should be allayed insofar as a user or consumer who fails to discover a defect cannot be liable for contribution to a strictly liable distributor. See, also, *Frey v. Montgomery Ward & Co., Inc.*, Minn., 258 N.W.2d 782 (filed September 28, 1977) (Kelly, J., concurring).

5. *Damages.*

Defendant GM claims that the damages awarded to Angeline Busch, Lando Busch, Francis Vohnoutka, and Kathleen Vohnoutka are excessive and alleges numerous errors on the part of counsel and the court.

The following injuries were sustained by the plaintiffs in this action:

Angeline Busch sustained a spinal-cord injury causing quadriplegia. Mrs. Busch was in good health prior to the accident but is now confined to a wheelchair. She was hospitalized for about 12 weeks and subsequently spent 19 weeks at the Sister Kenny Institute in Minneapolis to complete a rehabilitation program.

Mrs. Busch will be subject to future medical problems, such as progressively increasing muscle spasticity, possible infection, and severe bed sores.

Lando Busch suffered a 10-inch laceration of his upper forehead, bruises and contusions in the upper chest, fractures of the third and fourth vertebrae, six rib fractures, subluxation of a cervical vertebra, and an undisplaced fracture of the scalpula. Treatment of these injuries required 6 weeks of hospitalization.

Mr. Busch was permitted to return to his normal work on April 1, 1974.

Francis Vohnoutka sustained a compound fracture-dislocation of his left ankle, a fracture of the left scalpula, severe contusions on the left shoulder, a fracture of the left clavicle, a brachial plexus (stretch-type injury to the nerves) in the left shoulder, and about 50 cuts which resulted in keloid scars on his back, shoulders, and neck. He was hospitalized for almost 4 weeks. Mr. Vohnoutka regained the full range of motion of his left arm and shoulder within 6 months after the accident, although he indicated that he still has occasional discomfort in that area. Corrective surgery to help the pain and movement of the ankle was being planned at the time of trial. The scars present primarily a cosmetic problem, although they do itch and become irritated by certain clothing and perspiration.

Mr. Vohnoutka received medical advice that he should not return to his preaccident occupation as an assembly welder which involved heavy lifting.

Kathleen Vohnoutka received a compound fracture of her left forearm, a dislocation of her left elbow, two lacerations on the left arm, a compression fracture of a vertebra, a fracture of the pelvis, a slight separation of the sacroiliac joint, and a displaced fracture of one rib. She was hospitalized for 31 days after the accident and for an additional 6 days 1 year later for surgical removal of metal plates from her arm.

Mrs. Vohnoutka returned to her preaccident employment as a bookkeeper and typist after missing 4 months of work. Cosmetic surgery is required for scars on the left forearm. Mrs. Vohnoutka is experiencing continued lower back discomfort and tenderness in the left forearm, for which improvement is not expected.

The other damage awards are not in issue.

a. *Expert testimony on inflation factors.* The defendants' first general contention is that the trial court erroneously permitted expert testimony regarding inflation to be considered by the jury in arriving at an appropriate discount factor.

Our recent decision in *Ossenfort v. Associated Milk Producers, Inc.,* Minn., 254 N.W.2d 672 (1977), is dispositive of this issue. There, we sanctioned the admission of expert testimony regarding inflation rates in determining the ultimate damages to be awarded. In justifying a discount factor as low as 1 percent, because of considerations of inflation, we stated (254 N.W.2d 684):

"* * * In allowing courts to instruct and counsel to argue that the jury may consider inflation, we have taken the position that inflation is a fact of life which cannot fairly and realistically be ignored."

b. *Instructions on discounting future damages.* Defendants' second objection is that the trial court erroneously instructed the jury on discounting future

damages to present cash value. The following instruction was given by the trial court:

"After finding the dollar value of future damage for loss of future earning capacity, or whatever future damage— may be future medical supplies and hospital medical expenses, or future attendant care—you must then find the present cash value of such amount and award only the present cash value of such future damages.

"Present cash value is determined by a method of discount. It is a present sum of money which together with what that money may reasonably be expected to earn in the future for the period you have determined the person named will suffer such loss, when invested at a reasonable rate of return, will produce the dollar equivalent of such future damage."

Defendants contend that the final sentence of this standard instruction, set forth below, should have been included, and the failure to include this sentence makes the instruction as given meaningless, improper, and prejudicial:

"Because of this discount requirement, the present cash value of future damage will be a *lesser sum* than the amount you have found to be such future damage." (Italics supplied.)

Although the trial court did omit this final sentence from the standard instruction, it can hardly be argued that this renders the instruction meaningless. The instruction as given states that damages must be discounted to present cash value. Further, ample expert testimony was received instructing the jury on the discount formula, as well as on the factors to be considered in discounting to present cash value. The jury is generally left to its own good discretion as to what discount factor should actually be used. The instruction as given fairly states the substance of the law. In *Smith v. The Kahler Corp. Inc.*, 297 Minn. 272, 282, 211 N.W.2d 146, 153 (1973), citing *Cameron v. Evans*, 241 Minn. 200, 62

N.W.2d 793 (1954), and *Manion v. Tweedy*, 257 Minn. 59, 100 N.W.2d 124 (1959), we stated:

"'* * * [T]he charge of the trial court must be viewed in its entirety and from a practical and commonsense point of view. The trial court is allowed considerable latitude in the language used, and a new trial will not be granted where requested instructions are refused when the general charge fairly and correctly states the applicable law. All that is required is that the charge as a whole convey to the jury a clear and correct understanding of the law. It is unnecessary that every possible opportunity for misapprehension be guarded against. If the charge fairly lays down the law of the case, it is sufficient.'"

We find that standard to have been met in the present case.

c. *Excessiveness of damages.* The next general claim of error, and the one *principally* relied on by GM is that the verdicts violate the rule of *Hallada v. G. N. Ry. Co.*, 244 Minn. 81, 69 N.W.2d 673 (1955), and its progeny.[18] In *Hallada* we stated, inter alia (244 Minn. 97, 99, 69 N.W.2d 686, 687):

"* * * The reasonableness of an award for damages can be appraised only in the light of the elementary principle that plaintiff should be given neither more nor less than a sum which leaves him financially *whole* to the same extent as he would have been had no injury occurred. *Whether an injured person has been made financially whole must be tested by determining what the total amount of damages awarded by the jury will accomplish for him if conserved and used with ordinary prudence.* Here we have a verdict of $170,154.81. If this sum is invested at three percent plaintiff will receive in interest alone an annual income of $5,104.64 or slightly less than his regular preinjury income at $5,400. * * *

18. *Ahlstrom v. Minneapolis, St. P. & Sault Ste. Marie R. Co.*, 244 Minn. 1, 68 N.W.2d 873 (1955); *Cox v. Chicago, Rock Island & Pacific Railroad Co.*, 250 Minn. 187, 84 N.W.2d 263 (1957); *McCrank v. Great Northern Ry. Co.*, 260 Minn. 329, 109 N.W.2d 582 (1961); *Sorenson v. Cargill, Incorporated*, 281 Minn. 480, 163 N.W.2d 59 (1968).

*When his life expectancy expires he will still possess the entire principal sum of $170,154.81.* * * *

\* \* \* \* \* \*

" * * * Whatever process is adopted in fixing an injured person's damages, the reasonableness of the lump sum awarded by the jury must, in the last analysis, also be tested from the unitary standpoint of what total financial benefits that lump sum will confer upon the injured person as a means of making him financially *whole*. No award can be sustained unless it stands the test of reasonableness in the light of its over-all effect." (Italics supplied in part.)

In *Hallada*, the plaintiff's judgment included an award for pain and suffering, as well as damages for lost earning capacity. The court applied what it believed to be a reasonable rate of interest to the lump sum to test its total investment return against preinjury earning capacity. Because the lump-sum award when invested would yield an amount close to plaintiff's preinjury earning capacity and would still leave him with the principal judgment amount at the end of his life expectancy, the verdict was held excessive and the judgment thereby reduced.

In the instant case, the defendants argue that the total awards for pain and suffering, medical expenses, and lost earning capacity, if invested at 8 percent, which expert testimony indicated was the rate available, would yield an amount greater than the projected annual medical expenses and lost earning capacity of each party and still leave them with the total award at the end of their life expectancy. This, they argue, violates the *Hallada* test of reasonableness and all judgments should be reduced accordingly.

The *Hallada* line of cases will not be applied in this case. *Hallada* involved both a misapplication of a mathematical formula and the improper use of per diem arguments to award excessive verdicts. No similar misapplication of mathematical formulas or per diem arguments occurred here.

If defendants' argument is followed, an injured plaintiff must invest her pain, suffering, and disability awards and use the interest accruing thereon for future medical expenses and wage losses. The law generally recognizes no such requirement. An award for pain and suffering is a separate and distinct item of damage. The purpose of giving damages for pain and suffering is to compensate the injured party for his loss, not to reimburse him for his future expenses. To the extent the *Hallada* case is inconsistent with this opinion, it is expressly overruled.

Defendants further argue that the damages awarded are excessive as a result of passion and prejudice, errors of law, and cannot be sustained by the evidence. Although the trial judge ordered remittiturs for three plaintiffs, the defendants argue that the verdicts are still unduly large and should be further reduced.

In order to evaluate these claims, it is necessary to examine each award individually. All of the contested awards, except the award to Mrs. Busch, are general awards, and it is difficult to determine the precise figures and factors that went into the jury's determination of its awards. Mrs. Busch's award was only broken down into future medical expenses and general damages.

(1) *Angeline Busch.* The parties vigorously dispute the total amount of damages allowable to Mrs. Busch under the evidence presented at trial. Specifically, the defendants contend that the amounts awarded for attendant care required by Mrs. Busch on a 24-hour basis, as well as the amounts allotted for other medical expenses, such as drugs, hospitalization, and the like, are unduly large due to jury confusion and errors in argument and law.

The jury could have found that Mrs. Busch had approximately $36,000 of annual future medical expenses, including the sums of $30,000 for future attendant care and $6,000 for the remaining medical expenses. Based on this total figure, an average life expectancy of 29.4 years, which the parties stipulated was the average life expectancy

of a woman of Mrs. Busch's age, with a discount to present value of 1 percent,[19] an award of more than $910,000 is sustainable. Because the jury could have used a discount factor as low as .4 percent,[20] and because Mrs. Busch could live longer than 29.4 years, the medical expenses award of $1,000,000, although extremely liberal, is within the maximum limits sustainable by the evidence.

A further award of $800,000 for general damages, including pain and suffering, was awarded Mrs. Busch. The determination of this amount is generally left to the discretion of the jury and trial court. In view of the devastating injuries incurred by Mrs. Busch and the future pain and suffering she will have to endure, this award does not seem unreasonable. In this regard, it is significant to note that the trial judge in his remittitur order refused to reduce the general damages award given to Mrs. Busch. He stated:

"Having in mind the age of Mrs. Busch at the time of the accident, the almost 100 per cent quadraplegia she suffered, and, most particularly the certainty of the reduction of her prospect for future enjoyments of life, the Court did not feel that the general damage award should be reduced in the least. Here, the Court had in mind that pain isn't necessarily restricted to physical pain and also that Mrs. Busch must-needs pay her expenses * * * out of this figure also."

The judicial function of determining the amount of a verdict in a personal-injury case has been historically reserved to the jury. In this case, the trial judge did not reduce the award for pain and suffering, but did reduce the award for special damages. Appellate courts are not prone to interfere unless it clearly appears that there has been an abuse of judicial discretion. *Cameron v. Evans*, 241 Minn. 200, 209, 62 N.W.2d 793, 799 (1954); *Kelley v. Chicago B. & Q. R. Co.*, 142 Minn. 44, 170 N.W. 886 (1919). In this case the evidence supports the award, and no abuse of discretion appears.

■ Defendants further claim that counsel for Mrs. Busch improperly argued to the jury double inflation factors, causing confusion and resulting in an excessive damage award. In his final summation, counsel for Mrs. Busch argued that the awards for future medical expenses should be reduced to present value by using an inflation-adjusted discount factor as low as .4 percent. Immediately after applying this low discount factor, counsel then argued that the jury should add an additional inflation factor to the total damages.

It appears to us that such an argument is improper. By using a low discount factor, the verdict is substantially increased. If the jury added an additional inflation factor to a discounted award that had been previously adjusted by inflation, the verdict could have been unreasonably increased. However, in light of the court's instructions to the jury and the subsequent remittitur order, we find that the improper argument was not prejudicial in this case.

■ (2) *Lando Busch*. As part of the testimony concerning his damages, the trial court permitted Mr. Busch to describe the problems Mrs. Busch experiences while living in their home in its present condition. Thereafter, Dr. Sperling testified about the facilities which should be available in the Busch home to provide Mrs. Busch with optimum home care. The trial court instructed the jury that Mr. Busch's claim "may include the reasonable value of such modifications of the family home as are reasonably necessary for the proper care, comfort, and convenience of his wife Angeline Busch."

GM objects to this testimony as a basis for a damage award principally because no evidence of the cost of installing these modifications in the Busch home was ever received.

**19.** Professor Edward Foster concluded that the average "real rate of interest," due to factors of inflation and the like, for the period from 1947 to 1975 had been approximately 1 percent.

**20.** Professor Foster testified that for the period between 1966 and 1976 the average "real rate of interest" was 0.4 percent.

The general rule is that a jury may not base an award of substantial damages on speculation and conjecture. Dobbs, Remedies, p. 151. "Thus it is frequently said that the plaintiff must put on as much certain evidence as is reasonable in the nature of the case." Ibid., note 15.

In *Harrow v. St. Paul & Duluth R. Co.*, 43 Minn. 71, 72, 44 N.W. 881 (1890), a case involving the negligent destruction of a chattel, this court held that at least some specific evidence of value or cost is needed before a jury may award substantial damages and that any award given by the jury for this element of damages without such evidence would be improper.

▮▮▮ GM's next claim of error involves the damages awarded to Mr. Busch for loss of consortium. Mr. Busch attempted to quantify a portion of his loss of consortium by focusing on the economic value of the *household services* Mrs. Busch performed. The Busch's daughter, Judy Busch Palmstein, testified that when all six children were living at home, Mrs. Busch devoted approximately 70 hours per week to household activities. Joseph Steen, an employment specialist, then determined the reasonable value of Mrs. Busch's services to Mr. Busch to be $284.48 per week. GM contends that the trial court erred in permitting Mr. Steen's testimony on the ground that the foundation evidence for his opinions was inadequate.

This argument fails because the record reveals ample testimony from which Mr. Steen could have drawn his conclusions. Additionally, the trial court has great discretion in determining the sufficiency of foundation laid for expert opinion. As this court stated in *Briggs v. Chicago G. W. Ry. Co.*, 248 Minn. 418, 429, 80 N.W.2d 625, 635 (1957):

"* * * Whether a hypothetical question presents an adequate foundation for an expert opinion rests largely in the discretion of the trial court and its decision will not be reversed except for a clear abuse of that discretion. Although the burden of framing an adequate hypothetical question rests upon the pro-

pounder and he may not cast the burden of supplying its deficiencies upon opposing counsel, nevertheless, in passing upon the question of whether prejudicial error occurred, it is not to be overlooked that an adversary enjoys certain safeguards in that he may on cross-examination supply omitted facts and ask the expert if his opinion would be modified by them."

Defense counsel could have cross-examined Mr. Steen to point out any deficiencies in the hypothetical question upon which his opinion was based. Professor Steen's testimony was based upon ample foundation, and the jury could reasonably have believed and considered it in making their award.

GM next claims that this 70-hour-a-week figure was in fact a "thinly-veiled per diem argument." Per diem arguments have been proscribed only in damage awards for pain and suffering, and for other generally non-quantifiable compensatory awards. *Ahlstrom v. Minneapolis, St. P. & Sault Ste. Marie R. Co.*, 244 Minn. 1, 29, 68 N.W.2d 873, 890 (1955); 60 Mich.L.Rev. 612 (1962). In this case, the loss by Mr. Busch of his wife's future services can be measured with a degree of objective certainty without the consequent misleading problems inherent in more subjective recoveries. Cf. Dobbs, Remedies, p. 545. We have been reluctant in past cases to set aside even the most generous awards for loss of consortium. *Ossenfort v. Associated Milk Producers, Inc.*, Minn., 254 N.W.2d 672; *Thill v. Modern Erecting Co.*, 292 Minn. 80, 193 N.W.2d 298 (1971).

▮▮▮ GM also claims error in regard to Mr. Busch's claim for lost future earning capacity. It is asserted that Mr. Busch's injuries did not affect his future earning ability and that no evidence was given which would tend to support such a loss. It appears that all the evidence given on this point relates to loss of wages and income only up to the time of trial and not to loss of future income or earning capacity. Any damages allotted to Mr. Busch on this basis, therefore, are improper. Without at least some evidence of lost earning capacity, the jury should not be allowed to consider it as

a potential basis for their verdict. In *Young v. Hansen*, 296 Minn. 430, 434, 209 N.W.2d 392, 395 (1973), we stated:

" * * * Where a permanent impairment or loss of earning capacity is claimed by a plaintiff, he must establish by a fair preponderance of the evidence the extent to which such impairment is reasonably certain to occur."

To summarize, plaintiff Lando Busch was awarded total damages in the amount of $608,500. The jury was improperly allowed to consider the value of home improvements and modifications, as well as Mr. Busch's loss of future earning capacity. Nonetheless, assuming that the maximum amounts were awarded by the jury, Mr. Busch's verdict of $608,500 is still within the bounds of the highest sustainable award under the evidence. As stated, however, the effect of allowing the jury to consider damages for the loss of future earning capacity and home modification costs cannot be known and probably increased the award. The trial court's order of a remittitur of $135,-400 removed any prejudice to GM.

■ (3) *Francis Vohnoutka.* As in the case of Lando Busch, GM contends that damages for lost future earning capacity were improperly awarded to Mr. Vohnoutka.

Prior to the accident, Mr. Vohnoutka was an assembly welder. Because of postaccident injuries, Mr. Vohnoutka was unable to continue as a welder and began training as a draftsman.

GM contends that the lost future-earning-capacity award cannot be upheld in light of the fact that experienced entry-level draftsmen are compensated at approximately the same rate as assembly welders.

This argument is not fully supported by the record. Mr. Vohnoutka is studying to become a mechanical draftsman. Upon scrutiny of the expert testimony involved, it appears that mechanical draftsmen were earning somewhat less than assembly welders. Thus, some award for lost future earning capacity can be sustained by the evidence, but the amount is unclear.

Further, Mr. Vohnoutka testified that prior to the accident he spent 15 to 20 hours a week maintaining his duplex, yard, automobile, and doing other household jobs. After the accident, he estimated 5 to 6 hours per week were devoted to those activities. Mr. Steen computed the approximate value of these household services to be $3.58 to $5.63 per hour. GM's objection to this testimony as lacking foundation is without merit. There was ample testimony from which a jury could have reasonably found damages in this regard.

Taken in the light most favorable to the prevailing party, the maximum award sustainable under the evidence, including loss of consortium and pain and suffering, could well have been above the $250,000 award actually given by the jury. The remittitur order removed any possible error caused by an improper award of future earnings.

■ (4) *Kathleen Vohnoutka.* GM objects to the award given Mrs. Vohnoutka because the jury was allowed to consider Mrs. Vohnoutka's lost future earning capacity and because her award violates the *Hallada* rule.

The effect of any errors is impossible to know, but the trial judge in a post-trial memorandum declined to order a remittitur in Mrs. Vohnoutka's case, holding that the evidence amply supported the verdict. As stated above, where the trial judge has allowed the verdict to stand, appellate courts are not prone to interfere unless there has been a clear abuse of discretion. No such abuse appears in this case. *Cameron v. Evans*, 241 Minn. 200, 209, 62 N.W.2d 793, 799.

■ d. *Remittitur orders.* The trial judge ordered remittiturs for three of the plaintiffs, who now object to the reduction of their awards. *Jangula v. Klocek*, 284 Minn. 477, 488, 170 N.W.2d 587, 594 (1969), permits review of this order despite their consents. The standard for reviewing a remittitur is the same as if a new trial had been granted unconditionally. *Rheiner v. Stillwater Street Railway and Transfer Co.*, 29 Minn. 147, 12 N.W. 449 (1882). A new

trial may be granted pursuant to Rule 59.-01(5), Rules of Civil Procedure, on the ground that an excessive verdict appears to have been given under the influence of passion and prejudice, or under Rule 59.-01(7), on the ground that the damages are not justified by the evidence. The defendants in this case also argue that the *Hallada* line of cases provide a basis for granting a new trial.

Traditionally, the question of whether a verdict should be set aside as being excessive has been left to the discretion of the trial judge and should not be interfered with on review unless there was a clear showing of abuse of that discretion. *Bisbee v. Ruppert*, 306 Minn. 39, 235 N.W.2d 364 (1975); *Hagen v. Swenson*, 306 Minn. 527, 236 N.W.2d 161 (1975); *In re Petition of Sandt v. Hylen*, 301 Minn. 475, 224 N.W.2d 342 (1974); *Stenzel v. Bach*, 295 Minn. 257, 203 N.W.2d 819 (1973). Although not wholly disavowing this broad discretionary authority of the trial courts, more recent decisions of this court have indicated a slightly stricter standard by which to grant or deny new trials. See, *Koenig v. Ludowese*, Minn., 243 N.W.2d 29 (1976).

Nevertheless, we are reluctant to substitute our judgment on the remittiturs for that of a trial court judge who presided over a difficult trial lasting 12 weeks. Although in some instances he may not have fully articulated his reasons for ordering the remittiturs and in other instances he may have given reasons we do not believe to be proper bases for ordering remittiturs, where reasons do exist independently of those cited by the trial court to reduce the awards, the decision so made should stand.

In the case of Angeline Busch, the court indicated that mathematical formulas were misapplied but did not explain how they were misapplied. On the basis of the evidence presented, it was possible for the trial judge to decide that the award of $1,000,000 for medical expenses was excessive because of the double-inflation factor although the award for general damages was not excessive. As to Lando Busch, the lack of evidence bearing on the costs of necessary

modifications of the family home and on the loss of future earnings would justify a remittitur. The lack of sufficient evidence of loss of future earnings with respect to Francis Vohnoutka likewise justifies upholding the trial court's remittitur in his case. The awards, even as reduced, remain liberal.

■ e. *The order awarding Angeline Busch damages for her future medical care.* Because Mrs. Busch agreed to allow her past medical expenses to be a part of her husband's case, this issue arises only with regard to future medical expenses. Minn.St. 519.05 provides:

"Liability of husband and wife. No married woman shall be liable for any debts of her husband, *nor shall any married man be liable for any torts, debts, or contracts of his wife, committed or entered into either before or during coverture, except for necessaries furnished to the wife after marriage, where he would be liable at common law.* Where husband and wife are living together, they shall be jointly and severally liable for all necessary household articles and supplies furnished to and used by the family." (Italics supplied.)

Under this statute, this court in *Boland v. Morrill*, 275 Minn. 496, 498, 148 N.W.2d 143, 145 (1967), examined a wife's right to recover her own medical expenses and stated:

"It is a widely accepted general rule that at common law, and even under provisions of modern statutes emancipating a married woman from her husband, the husband is deemed to have the exclusive right to recover for past medical expenses made necessary by injury to his wife and the wife has no right of action except under unusual circumstances such as where she has paid or expressly or impliedly assumed liability for such expenses. Annotation, 66 A.L.R. 1189. The reason for the rule is that married women's acts removing the disability of married women to independently contract and incur liability were not intended to free the husband of his common-law duty to support his wife and to be liable for

her necessities. Our agreement with the general rule was first declared in *Belyea v. Minneapolis, St. P. & S. S. M. Ry. Co.*, 61 Minn. 224, 63 N.W. 627. Earlier, *Skoglund v. Minneapolis St. Ry. Co.*, 45 Minn. 330, 47 N.W. 1071, 11 L.R.A. 222, recognized the husband's right to recover."

A more recent case upholding the rule of *Boland v. Morrill* is *Janke v. Janke*, 292 Minn. 296, 195 N.W.2d 185 (1972), which, after considering the rule in light of the then recent abrogation of interspousal tort immunity in *Beaudette v. Frana*, 285 Minn. 366, 173 N.W.2d 416 (1969), upheld the husband's exclusive right to sue for his wife's medical expenses. See, also, *Plain v. Plain*, 307 Minn. 399, 240 N.W.2d 330 (1976). The *Janke* and *Boland* cases were based on the assumption that Minn.St. 519.05 requires that *only* the husband could be responsible for his wife's medical expenses. We think that assumption reflects an outmoded view of the statute.

Angeline Busch has made it clear she wants to be and intends to be liable for her own future medical expenses. To deny her the right and the responsibility to make that choice seems to be turning the calendar back to the last century. A wife is no longer considered a chattel of her husband, unable to vote, to hold property, or to contract. She now has all of these rights. If a husband were to receive the funds for his wife's future needed medical care, he could succeed in dissipating them. We do not believe a woman should be left dependent upon the ability and generosity of her husband to keep and to maintain those funds which were specifically provided for her care.

The constitutionality of this statute was not raised, thus we decline to rule on the issue; however, we believe the legislature should consider the repeal or modification of § 519.05. It is a vestige of an earlier era when the husband was the sole income producer in the family, and it was intended to insure that he would provide his spouse with the necessities of life. It was also intended to insure that suppliers of such services would not hesitate to provide those services for fear that they would not be paid. This law has no place in the statute books today where a significant percentage of married women are working to help support the family, where national policy requires access to individual credit regardless of sex, and where group insurance and other supportive means exist to provide payments for medical care.

We hold that the statute does not relieve the wife of liability to pay for her necessities, but vests a secondary liability in her husband. Since modern law now permits both husband and wife to legally contract, we hold that she, as well as her husband or any other adult, may contract and be primarily responsible for any legal obligation resulting from that contract. The statute creates an obligation in the husband to pay in case of default by the wife.

We therefore hold that a wife, including Angeline Busch, is primarily responsible for her own debts, whether necessities or non-necessities, and her husband is made secondarily responsible for necessities by the statute.[21]

We hold that Angeline Busch may recover her own future medical and attendant care costs. Because, however, her husband could conceivably be liable in the future, we hold it is not unreasonable for him, in a case like this, to move the trial court for an order that the funds for future medical and attendant care be placed in trust, subject to further orders of the court. The trust would be maintained similarly to those for funds held under guardianship, to be used solely for the purposes for which recovery was made.[22]

**21.** We note that our interpretation of Minn.St. 519.05 is not inconsistent with its legislative intent; the statute was originally part of a legislative scheme to expand the rights of married women. See, *Gillespie v. Gillespie*, 64 Minn. 381, 67 N.W. 206 (1896).

**22.** The residual necessity for suggesting such trusts, the fact that they apply primarily to women, children, and other wards of the court, and possible adverse tax consequences are all further proof of the outmoded policies embodied in the statute.

The trial court is therefore affirmed in all respects.

OTIS and TODD, JJ., took no part in the consideration or decision of this case.